# 18-1597

## United States Court of Appeals
## For the Second Circuit

RAVIDATH LAWRENCE RAGBIR, NEW SANCTUARY COALITION OF NEW
YORK CITY, CASA DE MARYLAND, INC., DETENTION WATCH
NETWORK, NATIONAL IMMIGRATION PROJECT OF THE NATIONAL
LAWYERS GUILD, NEW YORK IMMIGRATION COALITION,

*Plaintiffs-Appellants*,

v.

THOMAS D. HOMAN, in his official capacity as Deputy Director and
Senior Official Performing the Duties of the Director of U.S.
Immigration and Customs Enforcement, *et al.*
(addition Defendants listed on inside cover)

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Southern District of New York
Case No. 18-CV-1159 (Hon. P. Kevin Castel)

### BRIEF OF PLAINTIFFS-APPELLANTS

Alina Das
Jessica Rofé
WASHINGTON SQUARE
  LEGAL SERVICES, INC.
Immigrant Rights Clinic
New York University School of Law
245 Sullivan Street, 5th Floor
New York, New York 10012
(212) 998-6430
alina.das@nyu.edu

R. Stanton Jones
William C. Perdue
Sally L. Pei
Andrew T. Tutt
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999
stanton.jones@arnoldporter.com

*Counsel for Plaintiffs-Appellants (additional counsel listed on inside cover)*

THOMAS DECKER, in his official capacity as New York Field Office Director for U.S. Immigration and Customs Enforcement, SCOTT MECHKOWSKI, in his official capacity as Assistant New York Field Office Director for U.S. Immigration and Customs Enforcement, UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, KIRSTJEN M. NIELSON, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, JEFFERSON B. SESSIONS III, in his official capacity as Attorney General of the United States, UNITED STATES DEPARTMENT OF JUSTICE,

*Defendants-Appellees.*

---

Emily Newhouse Dillingham
ARNOLD & PORTER
  KAYE SCHOLER LLP
70 West Madison Street
Suite 4200
Chicago, IL 60602
(312) 583-2300
(312) 583-2360 (fax)
emily.dillingharn@arnoldporter.com

Ada Añon
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
(303) 836-8689 (fax)
ada.anon@arnoldporter.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF JURISDICTION.................................................................... 4

STATEMENT OF ISSUES ................................................................................. 5

STATEMENT OF THE CASE ............................................................................ 5

I.     Factual Background ..................................................................................... 5

       A.     Mr. Ragbir's Lawful Residence in the United States............................ 5

       B.     Mr. Ragbir's Activism and Defendants' Retaliation ............................ 8

       C.     Defendants' Pattern and Practice of Targeting Immigrant-Rights
            Activists............................................................................................... 13

II.    Procedural History ...................................................................................... 15

       A.     Proceedings Before the District Court ................................................. 15

       B.     The Decision Below .......................................................................... 17

       C.     Stay Proceedings ................................................................................. 19

SUMMARY OF ARGUMENT ............................................................................ 21

STANDARD OF REVIEW ................................................................................. 22

ARGUMENT ...................................................................................................... 23

I.     The District Court Had Subject-Matter Jurisdiction over Plaintiffs' First
      Amendment Claims ..................................................................................... 23

       A.     Section 1252(g) Does Not and Cannot Constitutionally Bar All
            Judicial Review of Colorable Constitutional Claims ........................... 23

1.     § 1252(g) Is Unconstitutional as Applied if it Bars All Judicial Review of Colorable Constitutional Claims................24

2.     Congress Did Not Clearly Intend § 1252(g) to Bar All Judicial Review of Colorable Constitutional Claims...............30

B.    Plaintiffs' First Amendment Claims Are Colorable ..........................35

1.     The Government's Retaliation against Public Criticism Here Is an "Outrageous" Violation of the First Amendment ...........35

2.     Mr. Ragbir's Final Removal Order Does Not Defeat Plaintiffs' Retaliation Claims....................................................44

II.    The Remaining Factors Heavily Favor Preliminary Relief...........................48

A.    Plaintiffs Will Suffer Irreparable Harm Absent Relief ......................48

1.     Mr. Ragbir Will Suffer Irreparable Harm if He Is Deported....48

2.     The Coalition Will Suffer Irreparable Harm if Mr. Ragbir is Deported ....................................................................................53

B.    The Balance of Hardships and the Public Interest Favor Preliminary Relief ......................................................................................................54

CONCLUSION ....................................................................................................57

CERTIFICATE OF SERVICE .............................................................................59

CERTIFICATE OF COMPLIANCE.....................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Arce v. United States,*
-- F.3d --, 2018 WL 3763524 (9th Cir. Aug. 9, 2018).......................................31

*Arizona v. United States,*
567 U.S. 387 (2012)........................................................................54

*Backpage.com, LLC v. Dart,*
807 F.3d 229 (7th Cir. 2015) ...............................................................36

*Bantam Books, Inc. v. Sullivan,*
372 U.S. 58 (1963)..........................................................................36

*Battaglia v. General Motors Corp.,*
169 F.2d 254 (2d Cir. 1948) .............................................................27, 28

*Board of County Commissioners v. Umbehr,*
518 U.S. 668 (1996)........................................................................36

*Bronx Household of Faith v. Bd. of Educ. of the City of N.Y.,*
331 F.3d 342 (2d Cir. 2003) ............................................................48, 50

*Buckley v. Am. Constitutional Law Found., Inc.,*
525 U.S. 182 (1999)........................................................................37

*Calcano-Martinez v. INS,*
232 F.3d 328 (2d Cir. 2000), *aff'd* 533 U.S. 348 (2001).............................26, 33

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.,*
850 F.3d 58 (2d Cir. 2017) .................................................................34

*Chalk v. U.S. Dist. Court Cent. Dist.,*
840 F.2d 701 (9th Cir. 1988) ...............................................................51

*City of Houston v. Hill,*
482 U.S. 451 (1987)........................................................................39

*Davis v. FEC,*
554 U.S. 724 (2008)........................................................................49

*Deferio v. City of Syracuse*,
193 F. Supp. 3d 119, 131 (N.D.N.Y. 2016).......................................................56

*Devitri v. Cronen*,
289 F. Supp. 3d 287, 294 (D. Mass. 2018), *appeal filed* (1st Cir.
Feb. 1, 2018) ....................................................................................................26

*Duamutef v. INS*,
386 F.3d 172 (2d Cir. 2004) .................................................................27, 34, 51

*Elrod v. Burns*,
427 U.S. 347 (1976)......................................................................................48, 50

*Gutierrez-Soto v. Sessions*,
No. EP-18-CV-00071-DCG, 2018 WL 3384317 (W.D. Tex. July
10, 2018) ............................................................................................................14

*Hamama v. Adducci*,
261 F. Supp. 3d 820 (E.D. Mich. 2017) ............................................................26

*Hartman v. Moore*,
547 U.S. 250 (2006)......................................................................................35, 45

*Hensley v. Mun. Court*,
411 U.S. 345 (1973)...........................................................................................24

*In re World Trade Ctr. Disaster Site Litig.*,
722 F.3d 483 (2d Cir. 2013) ..............................................................................47

*INS v. St. Cyr*,
533 U.S. 289 (2001)......................................................................................25, 34

*Jama v. INS*,
329 F.3d 630 (8th Cir.), *aff'd sub nom Jama v. ICE*, 543 U.S. 335
(2005) .................................................................................................................26

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018)....................................................................................31, 34

*Johnson v. Robison*,
415 U.S. 361 (1974)...........................................................................................30

*Jones v. Cunningham,*
371 U.S. 236 (1963) ........................................................24

*Kabenga v. Holder,*
76 F. Supp. 3d 480, 487 (S.D.N.Y. 2015) .........................52

*Kalaw v. Ferro,*
651 F. Supp. 1163 (W.D.N.Y. 1987)................................50

*Liranzo v. United States,*
690 F.3d 78 (2d Cir. 2012) .............................................22

*Lozman v. City of Riviera Beach,*
138 S. Ct. 1945 (2018)........................... 19, 38, 44, 45, 46, 47

*Luna v. Holder,*
637 F.3d 85 (2d Cir. 2011) .............................................26

*Martin v. Hunter's Lessee,*
14 U.S. 304 (1816)...........................................................29

*Matter of Acosta,*
19 I. & N. Dec. 211 (BIA 1985) ......................................41

*McCullen v. Coakley,*
134 S. Ct. 2518 (2014)...............................................49, 50

*Meyer v. Grant,*
486 U.S. 414 (1988).........................................................37

*N.Y. Progress & Prot. PAC v. Walsh,*
733 F.3d 483 (2d Cir. 2013) ...........................................56

*N.Y. Times Co. v. Sullivan,*
376 U.S. 254 (1964).........................................................39

*Nat'l Inst. of Family & Life Advocates v. Becerra ("NIFLA"),*
138 S. Ct. 2361 (2018).....................................................37

*Nwaokolo v. INS,*
314 F.3d 303 (7th Cir. 2002) ..........................................55

*Ogunwomoju v. United States*,
 512 F.3d 69 (2d Cir. 2008) ...........................................................24, 27

*Perry v. Sindermann*,
 408 U.S. 593 (1972)...............................................................25, 35, 36

*Preiser v. Rodriguez*,
 411 U.S. 475 (1973)................................................................................24

*Ragbir v. Holder*,
 389 F. App'x 80 (2d Cir. 2010) ............................................................7

*Ragbir v. Lynch*,
 640 F. App'x 105 (2d Cir. 2016) ......................................................7, 8

*Ragbir v. Sessions*,
 No. 18-236 (KBF), 2018 WL 623557 (S.D.N.Y. Jan. 29, 2018) ..............2, 8, 13

*Ragbir v. United States*,
 No. 18-2142 (3d Cir. Aug. 24, 2018) ...................................................6

*Ragbir v. United States*,
 No. 17-1256-KM, 2018 WL 1446407 (D.N.J. Mar. 23, 2018) ...............6, 13, 56

*Rajah v. Mukasey*,
 544 F.3d 427 (2d Cir. 2008) .................................3, 18, 38, 40, 41, 42

*Reno v. American-Arab Anti-Discrimination Committee ("AADC")*,
 525 U.S. 471 (1999).................................................................*passim*

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
 515 U.S. 819 (1995)................................................................................37

*Ruiz-Martinez v. Mukasey*,
 516 F.3d 102 (2d Cir. 2008) ......................................................26, 33

*Russello v. United States*,
 464 U.S. 16 (1983).................................................................................30

*Simmonds v. INS*,
 326 F.3d 351 (2d Cir. 2003) ...............................................................24

*Singh v. Gonzales*,
  499 F.3d 969 (9th Cir. 2007) ...............................................26

*Snyder v. Phelps*,
  562 U.S. 443 (2011)..........................................................36

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011).....................................................37, 49

*Swain v. Pressley*,
  430 U.S. 372 (1977)..........................................................25

*Thompson v. Choinski*,
  525 F.3d 205 (2d Cir. 2008) ...............................................24

*Ticor Title Ins. Co. v. Cohen*,
  173 F.3d 63 (2d Cir. 1999) .................................................53

*United States v. Ragbir*,
  38 F. App'x 788 (3d Cir. 2002) .............................................6

*Vencor Nursing Ctrs., L.P. v. Shalala*,
  63 F. Supp. 2d 1 (D.D.C. 1999).........................................51

*Webster v. Doe*,
  486 U.S. 592 (1988)................................................29, 30, 35

*Wilkie v. Robbins*,
  551 U.S. 537 (2007).........................................................35

*Xiao Ji Chen v. U.S. Dep't of Justice*,
  471 F.3d 315 (2d Cir. 2006) ...............................................25

*Y.C. v. Holder*,
  741 F.3d 324 (2d Cir. 2013) ...............................................43

*Ying Fong v. Ashcroft*,
  317 F. Supp. 2d 398 (S.D.N.Y. 2004) ................................13

## STATUTES

8 U.S.C. § 1159 ..................................................................43

8 U.S.C. § 1252 ..........................................................*passim*

28 U.S.C. § 1292 ......................................................................4

28 U.S.C. § 1331 .................................................................4, 22

28 U.S.C. § 1746 ....................................................................47

28 U.S.C. § 2241 ............................................................4, 23, 24

28 U.S.C. § 2254 ....................................................................27

U.S. Const. ....................................................................23, 28, 29

OTHER AUTHORITIES

8 C.F.R. § 241 ............................................................12, 13, 14

*Activism*, NPR (Mar. 16, 2018), https://n.pr/2HGXxEK ...........................14

Akhil Amar, *A Neo-Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction*, 65 B.U.L. Rev. 205, 246-47 (1985) .................29

Henry M. Hart, Jr., *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L. Rev. 1362, 1383 (1953) ......................................................................28

ICE, *Facilitating the Return to the United States of Certain Lawfully Removed Aliens* 1 (Feb. 24, 2012), https://goo.gl/vbPkox; .........................52, 54

*Immigrant Activist Granted Deportation Stay*, N.Y. Post (Feb. 10, 2018) ......................................................................39

Letter from Michael R. Dreeben, Deputy Solicitor Gen., U.S. Dep't of Justice, to Hon. William K. Suter, Clerk, Supreme Court of the U.S. 3-4 (Apr. 24, 2012), https://goo.gl/2zmv6B; .............................52

*Media*, Mijente (Feb. 26, 2018), https://bit.ly/2Lh4Owq .........................14

Nick Pinto, *Behind ICE's Closed Doors, "The Most Un-American Thing I've Seen,"* Village Voice (Mar. 10, 2017) .........................9, 11

# INTRODUCTION

The district court in this case "accepted as true" Plaintiffs' allegations and evidence that immigration officials are seeking to deport a leading immigrant-rights activist in retaliation for criticizing those same officials and the laws and policies they enforce. The district court also accepted that officials are doing so pursuant to a widespread pattern and practice that serves to insulate ICE and its enforcement powers from public debate and, ultimately, democratic accountability. Yet the court nevertheless held that no tribunal—state or federal, administrative or judicial—has jurisdiction to hear Plaintiffs' First Amendment claims seeking to prevent the activist's retaliatory deportation. The court further held that eliminating any and all judicial review of those claims was constitutional, because in the court's view, the First Amendment does not prohibit immigration officials from deporting a noncitizen pursuant to a policy of retaliating against public criticism. On that basis, the court denied Plaintiffs' motion for a preliminary injunction.

Plaintiff Ravidath Ragbir has resided in the United States with the U.S. government's express authorization for a quarter of a century, and over the last decade, he has become one of the nation's most influential advocates for immigrants' rights. Mr. Ragbir has a U.S.-citizen daughter, and he lives with his U.S.-citizen wife in Brooklyn. Since 2007, Mr. Ragbir has been subject to a final

order of removal, though he continues to challenge his removability and underlying criminal conviction.  Since his release from immigration detention in 2008, ICE has expressly authorized Mr. Ragbir to live and work in this country, subject to conditions that Mr. Ragbir has complied with at all times.

Mr. Ragbir is the Executive Director of co-Plaintiff the New Sanctuary Coalition of New York City.  He regularly organizes protests and speaks out against ICE officials and enforcement decisions.  In March 2017, as part of the Coalition's Accompaniment Program, Mr. Ragbir entered ICE's New York headquarters at 26 Federal Plaza for his own scheduled in-person check-in, accompanied by faith leaders, lawyers, family, community members, and local elected officials.  Afterwards, Mr. Ragbir and those with him spoke out against what they witnessed, and the event brought significant negative public attention to ICE and its policies.

In response, Defendants retaliated.  They surveilled the Coalition's offices, abruptly deported one of the Coalition's co-founders, and barred public access to the space where Coalition volunteers had accompanied noncitizens attending check-ins.  And on January 11, 2018, they arrested and attempted to deport Mr. Ragbir—without notice, in violation of governing regulations and standard practices, and in a manner a federal court later described as "unnecessarily cruel." *Ragbir v. Sessions*, No. 18-CV-236 (KBF), 2018 WL 623557, at *1 (S.D.N.Y. Jan.

29, 2018).  During this time, Defendants also lied to the Coalition and to counsel about their actions, expressed "resentment" toward Mr. Ragbir, and warned Coalition leaders, "you don't want to make matters worse by saying things."  Joint App.[1] at A-0123 (Dkt 17 at 7); A-0252 (Dkt 73 at 1); A-0262 (Dkt 74 at 8).  Nor is this is an isolated incident—Plaintiffs have identified more than a dozen instances nationwide in recent months where immigration officials have targeted noncitizens based on their protected advocacy for immigrants' rights.

The Supreme Court and this Court have indicated that deporting a noncitizen on this kind of "outrageous" basis violates the Constitution.  *See Reno v. American-Arab Anti-Discrimination Committee ("AADC")*, 525 U.S. 471, 491 (1999); *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008).  And while Congress in 8 U.S.C. § 1252(g) limited and channeled federal court jurisdiction over certain discretionary immigration enforcement actions, it did not and could not deprive Plaintiffs of *any* forum in which to assert their constitutional claims.  Holding otherwise would be an open invitation to unchecked abuse; it would allow immigration officials to censor, punish, or even compel any noncitizen speech they dislike for any reason, at any time, without any judicial review.

If immigration officials are permitted to deport Mr. Ragbir in retaliation for protected speech here, it will cause incalculable irreparable harm not only to Mr.

---

[1] Hereinafter, citations to the Joint Appendix will follow the format "A-___"

Ragbir and the Coalition, but to the First Amendment itself.  Only this Court can prevent that result.  The Court should reverse and remand.

## STATEMENT OF JURISDICTION

The district court's subject-matter jurisdiction is disputed.  Plaintiffs have asserted claims arising under federal law, giving the district court subject matter jurisdiction under 28 U.S.C. § 1331.  A-0041 (Dkt 1 at ¶ 10).  In addition, Mr. Ragbir has brought claims under the federal habeas corpus statute, 28 U.S.C. § 2241.  *Id.*  While certain provisions of 8 U.S.C. § 1252 limit and channel federal court jurisdiction over certain immigration matters, no provision strips federal courts of jurisdiction over Plaintiffs' claims here.  To the extent any statutory provision may be read to strip federal jurisdiction here, that provision is unconstitutional as applied under the Suspension Clause, the First Amendment, and Article III.

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).  Plaintiffs moved for a preliminary injunction on February 12, 2018.  A-0020 (ECF No. 11).  On May 23, 2018, the district court ruled that it lacked jurisdiction "to declare unlawful [or] to enjoin the execution of Ragbir's final order of removal."  A-0264 (Dkt 83 at 1).  The court dismissed Plaintiffs' claims seeking that relief, and denied Plaintiffs' motion for a preliminary injunction "insofar as it seeks to

stay removal of plaintiff Ragbir." A-0281-82 (Dkt 83 at 19-20). On May 25, 2018, Plaintiffs filed a timely notice of appeal. A-0286 (Dkt 84).

## STATEMENT OF ISSUES

1. Whether 8 U.S.C. § 1252(g) strips all federal courts of jurisdiction over Plaintiffs' First Amendment claims, and if so, whether § 1252(g) as applied is constitutional under the Suspension Clause, the First Amendment, and Article III.

2. Whether, consistent with the First Amendment, immigration officials may deport a noncitizen in retaliation against protected core political speech criticizing those same immigration officials and the laws and policies they enforce.

3. Whether deporting Mr. Ragbir would irreparably harm him or the Coalition.

4. Whether the balance of equities and public interest favor a temporary stay of removal pending resolution of the merits of Plaintiffs' claims, or pending resolution of the merits of Plaintiffs' motion for a preliminary injunction.

## STATEMENT OF THE CASE

### I.    Factual Background

### A.    Mr. Ragbir's Lawful Residence in the United States

Mr. Ragbir has lived in the United States with the authorization of the U.S. government for a quarter of a century. A native of Trinidad and Tobago, he received Lawful Permanent Resident status in 1994. His daughter, Deborah, a U.S.

citizen, was born here the following year.  A-0049 (Dkt 1 at ¶ 40).  He lives in Brooklyn with his wife, Amy Gottlieb, a U.S. citizen, lawyer, and fellow activist. A-0042, A-0050 (Dkt 1 at ¶¶ 14, 45).

In 2001, Mr. Ragbir was convicted of wire fraud arising out of his employment as a low-level mortgage loan processor.  *See United States v. Ragbir*, 38 F. App'x 788 (3d Cir. 2002).  The verdict, however, rested on jury instructions that the Supreme Court later rejected as improper.  *See Ragbir v. United States*, No. 2:17-CV-1256-KM, 2018 WL 1446407, at *15 (D.N.J. Mar. 23, 2018).  Mr. Ragbir also received ineffective assistance of counsel regarding the immigration consequences of his conviction and sentence.  *See id.*  The District of New Jersey has since held that Mr. Ragbir has shown a "likelihood of success on the merits" of his petition for a writ of coram nobis and has granted a temporary stay of removal pending resolution of that petition.  *Id.* at *12, 19.[2]

In 2006, after Mr. Ragbir completed his sentence, ICE initiated removal proceedings against him, and an immigration judge found Mr. Ragbir removable

---

[2] Mr. Ragbir's coram nobis proceedings remain pending.  The government has appealed the district court's stay of removal, and briefing will conclude on November 16, 2018.  *See Ragbir v. United States*, No. 18-2142 (3d Cir. Aug. 24, 2018).  Meanwhile, the district court held an evidentiary hearing on the merits of the coram nobis petition, and post-hearing briefing will conclude on September 14, 2018.  *See Ragbir v. United States*, 17- 1256-KM, ECF No. 71 (D.N.J. Aug. 20, 2018).  The current stay of removal pending resolution of the coram nobis petition may be lifted at any time after the completion of briefing before the district court or by the Third Circuit.

based on his conviction and sentence.  A-0265 (Dkt 83 at 3).  Mr. Ragbir's order of

removal became final in 2007, and this Court denied his petition for review in

2010.  *See Ragbir v. Holder*, 389 F. App'x 80 (2d Cir. 2010) (summ. order).  In

2016, this Court denied a second petition for review after the BIA denied Mr.

Ragbir's motion to reconsider or reopen his proceedings.  *Ragbir v. Lynch*, 640 F.

App'x 105 (2d Cir. 2016) (summ. order).  Mr. Ragbir has since filed a second

motion to reconsider or reopen his removal proceedings based on evidence

obtained during his coram nobis proceedings; that motion remains pending before

the BIA.  A-0050 (Dkt 1 at ¶ 45).  Mr. Ragbir also has a pending application for

adjustment of status based on his eight-year-marriage to Ms. Gottlieb.  *Id*.

Mr. Ragbir was detained throughout his immigration proceedings.  ICE

finally released Mr. Ragbir from custody in 2008 because he "did not commit a

crime of violence and does not appear to be a flight risk."  A-0050 (Dkt 1 at ¶ 44).

ICE released Mr. Ragbir pursuant to an Order of Supervision, which granted Mr.

Ragbir legal authorization to live and work in the United States.  *Id.*  The Order of

Supervision provides that if and when ICE should decide to deport Mr. Ragbir, he

"will, at that time, be given an opportunity to prepare for an orderly departure."  *Id.*

Typically, an "orderly departure" entails ICE giving a noncitizen several months'

notice to say goodbye, put his or her affairs in order, and purchase an airline ticket

or other means of travel before leaving the country.  A-0051 (Dkt 1 at ¶ 46);
A-0131 (Dkt 17 at ¶ 42).

Since his release from detention a decade ago, Mr. Ragbir has complied with
all conditions of his Order of Supervision, including attending regular in-person
check-ins with ICE.  Until January of this year, ICE not only never sought to
deport Mr. Ragbir, but also repeatedly granted him administrative stays of removal
affirmatively stating that ICE would *not* seek to deport him for a given period of
time.  A-0051 (Dkt 1 at ¶ 48).  Mr. Ragbir received his first administrative stay in
December 2011, and ICE renewed that stay three times.  *Id.*  In November 2017,
Mr. Ragbir applied to renew the stay a fourth time.  *Id.*  By its terms, Mr. Ragbir's
third stay renewal should have extended through January 19, 2018.  A-0056 (Dkt 1
at ¶ 64).

### B.    Mr. Ragbir's Activism and Defendants' Retaliation

"[S]ince his release from custody, [Mr. Ragbir] has lived a life of a
redeemed man."  *Ragbir*, , 2018 WL 623557, at *3 n.11.  Over the last decade, Mr.
Ragbir has become perhaps the most influential immigrant-rights activist in New
York City, and one of the most influential in the nation.  Among many awards
recognizing his advocacy, he recently received the Bishop's Cross from the
Episcopal Diocese of Long Island for his "exceptional service to the church and to
the community it serves."  A-0049 (Dkt 1 at ¶ 38).  He is the Executive Director of

co-Plaintiff the New Sanctuary Coalition, an interfaith network of congregations, organizations, and individuals who stand in solidarity with families and communities resisting detention and deportation. A-0043 (Dkt 1 at ¶ 15). Among other programs, Mr. Ragbir established the Coalition's Accompaniment Program, which has organized and trained hundreds of volunteers to accompany noncitizens to court dates and check-ins. These volunteers not only ensure that noncitizens do not face these difficult experiences alone, but also bear witness to the human costs of our current system of immigration detention and deportation. A-0048 (Dkt 1 at ¶ 35).

Mr. Ragbir has used his own experiences as a rallying point for his activism. On March 9, 2017, Mr. Ragbir reported to the ICE Field Office at 26 Federal Plaza for a scheduled check-in. Members of the community and the media gathered to support Mr. Ragbir and report on his experience. In the spirit of the Accompaniment Program he established, Mr. Ragbir was accompanied inside 26 Federal Plaza by family, lawyers, faith leaders, and local elected officials. A city councilmember later described the check-in room as "the most un-American thing I've seen in a very long time. It's one thing to hear about people with no legal representation. It is another thing to see a roomful of terrified people facing deportation with no legal representation at all." Nick Pinto, *Behind ICE's Closed Doors, "The Most Un-American Thing I've Seen*," Village Voice (Mar. 10, 2017),

https://bit.ly/2PzqMhy. ICE officials quickly demanded that Mr. Ragbir's companions leave the hallway outside check-in room. Afterwards, Mr. Ragbir and elected officials spoke out against ICE, and the event generated significant negative public attention for the agency. A-0051-53 (Dkt 1 ¶¶ 49-57).

Following Mr. Ragbir's March 2017 check-in, ICE's approach to the Coalition changed dramatically. For example, ICE had previously given Coalition volunteers open access to check-in appointments and immigration court appearances. A-0048 (Dkt 1 ¶ 35). But after March 2017, ICE began to limit access, even posting a security guard outside the formerly public check-in room to turn away faith leaders and other volunteers. A-0070 (Dkt 1 ¶ 111).

ICE's reaction to the Coalition escalated significantly in January 2018. On January 3, 2018, ICE began surveilling the Coalition's offices at Judson Memorial Church in Greenwich Village. A-0054 (Dkt 1 at ¶ 60). That day, without notice, ICE officers arrested activist Jean Montrevil, one of the Coalition's co-founders, while he was on a lunch break outside his home. A-0123 (Dkt 17 at ¶ 17). Like Mr. Ragbir, Mr. Montrevil had a pending motion to reopen his removal proceedings, and he has four U.S.-citizen children. Notwithstanding the existence of multiple detention facilities in the New York-New Jersey area, ICE immediately transferred Mr. Montrevil to a detention center in Florida. He was deported to Haiti just six days later. A-0054 (Dkt 1 at ¶ 58).

On January 5, 2018, faith leaders associated with the Coalition met with ICE New York Field Office Deputy Director Scott Mechkowski to discuss Mr. Montrevil's case. Unprompted, Mr. Mechkowski brought up Mr. Ragbir and his public remarks after his March 2017 check-in, and he disparaged the elected officials who had criticized ICE. A-0054-55 (Dkt 1 at ¶ 61). Mr. Mechkowski stated that Mr. Ragbir's and Mr. Montrevil's cases were the two "highest profile" cases in his office, and that ICE had planned Mr. Montrevil's arrest to avoid public outcry—ICE "didn't want the display of wailing kids and wailing clergy." *Id.* Mr. Mechkowski made clear that faith leaders could not accompany Mr. Ragbir to his next upcoming check-in. *Id.* Mr. Mechkowski denied that ICE was surveilling Mr. Ragbir, but stated: "I know where Mr. Ragbir lives, and I have seen him walking around, and I could have taken him myself." *Id.* Mr. Mechkowski also stated that he had told Mr. Montrevil directly: "You don't want to make matters worse by saying things." A-0252 (Dkt 73 at ¶ 1).

On January 8, 2018, Mr. Ragbir's counsel spoke with Mr. Mechkowski. Mr. Mechkowski stated that he had heard Mr. Ragbir's public statements and continued to see him at vigils at 26 Federal Plaza. Mr. Mechkowski expressed "resentment" about the March 2017 check-in, and anger about the presence of elected officials. A-0055-56 (Dkt 1 at ¶¶ 62-63). Mr. Mechowski also stated that no decision had

been made on Mr. Ragbir's pending application for a renewed stay. A-0056 (Dkt 1 at ¶ 64).

Mr. Ragbir reported for his next scheduled check-in on January 11, 2018. In a departure from standard practice, Mr. Mechkowski instructed Mr. Ragbir to report not to the assigned Deportation Officer, but directly to Mr. Mechkowski himself. A-0056 (Dkt 1 at ¶ 65). At the check-in, Mr. Mechkowski stated that a decision had been made that morning to deny Mr. Ragbir's application for a renewed stay, that ICE would not wait any longer for a decision on Mr. Ragbir's pending motion to reopen, and that Mr. Mechkowski would be "enforcing the order." A-0056-57 (Dkt 1 at ¶ 66). Mr. Mechkowski had Mr. Ragbir arrested then and there. Mr. Ragbir briefly lost consciousness. *Id.*

Contrary to applicable regulations and standard ICE practice, Defendants did not provide Mr. Ragbir or his representatives with an arrest warrant, *see* 8 C.F.R. § 241.2, 241.3(a), notice of the revocation of his Order of Supervision, *see* 8 C.F.R. § 241.4(l), or any notice or explanation for revoking his existing administrative stay, which by its terms did not expire for another week. A-0057-58 (Dkt 1 at ¶ 67). ICE officers also took Mr. Ragbir and his wife to separate hospitals, rushed his medical clearance, processed him curbside at Newark Airport, and flew him to a detention facility in Florida that afternoon. A-0057-58 (Dkt 1 at ¶¶ 67-68). ICE had purchased the tickets to Florida the previous day, and intended

to deport him the following morning, again in violation of applicable regulations. *Id.*; *see* 8 C.F.R. § 241.22; *Ying Fong v. Ashcroft*, 317 F. Supp. 2d 398, 403 (S.D.N.Y. 2004). Only a temporary stay issued by the District of New Jersey prevented Mr. Ragbir's immediate deportation. *See Ragbir v. United States*, No. 17 -1256-KM, ECF No. 16 (D.N.J. Jan. 11, 2018).

The day of his arrest, Mr. Ragbir's counsel filed a habeas petition, and on January 29, 2018, the district court granted the petition and ordered Mr. Ragbir's immediate release. Noting that "this country allowed [Mr. Ragbir] to become a part of our community fabric … [and] to build a life with and among us," the court held that ICE's actions evinced "unnecessary cruelty" and violated due process. *Ragbir*, 2018 WL 623557, at *2. The court described ICE's conduct towards Mr. Ragbir as "treatment we associate with regimes we revile as unjust." *Id.* at *1. The court further "note[d] with grave concern the argument that [Mr. Ragbir] has been targeted as a result of his speech and political advocacy on behalf of immigrants' rights." *Id.* at *1 n.1.

## C. Defendants' Pattern and Practice of Targeting Immigrant-Rights Activists

Mr. Ragbir is not the only noncitizen ICE has targeted in retaliation for advocating on behalf of immigrants' rights. Recent months have seen a sharp spike in immigration enforcement actions across the country targeting activists and protected political speech. For example:

- Last March, ICE officers arrested Daniela Vargas, a 22-year-old activist who came to the United States from Argentina when she was seven years old, as she was leaving a news conference in Jackson, Mississippi, where she had spoken out in support of DACA. A-0061 (Dkt 1 at ¶ 79-80).

- Over the next several months, ICE arrested four activists in Vermont associated with Migrant Justice, an immigrant and workers-rights organization. A-0061-63 (Dkt 1 at ¶¶ 81-86). In one case, "ICE noted in a charging document that the subject … is 'a member and associate of Migrant Justice, a local immigrant advocate group.'" John Burnett, *Immigrant Advocates Warn ICE Is Retaliating for Activism*, NPR (Mar. 16, 2018), https://n.pr/2HGXxEK.

- In December, ICE initiated removal proceedings against Maru Mora Villalpando, an outspoken activist in Seattle. A-0063-64 (Dkt 1 at ¶¶ 87-89). The official ICE record documenting Villalpando's removability expressly notes that she "has extensive involvement with anti-ICE protests and Latino advocacy programs." *ICE Targets Undocumented Immigrants Who Share their Story in the Media*, Mijente (Feb. 26, 2018), https://bit.ly/2Lh4Owq.

- Also in December, ICE arrested Baltazar Aburto Gutierrez, a clam harvester in Washington State, after he was quoted in local papers about his girlfriend's deportation. "You're the one from the newspaper," the ICE agent who detained him reportedly said. "My supervisor asked me to come find you because of what appeared in the newspaper." A-0064-65 (Dkt 1 at ¶ 90-92).

- Also in December, ICE revoked the parole of journalist Emilio Gutierrez-Soto after he publicly criticized ICE when receiving an award from the National Press Club. Mr. Gutierrez-Soto sued, and the Western District of Texas recently held that he raised genuine issues of material fact regarding whether ICE officials unlawfully retaliated against him in violation of the First Amendment. *Gutierrez-Soto v. Sessions*, No. EP-18-CV-00071-DCG, 2018 WL 3384317, at *2, 10 (W.D. Tex. July 10, 2018).

- In January, Amer Othman Adi, a 57-year-old Cleveland deli owner, began a hunger strike while in ICE custody. As his case drew media attention, his congressman introduced a private bill to allow him to remain in the country. The bill passed a House Subcommittee, but before it could become law, ICE abruptly deported Adi to Jordan. A-0066 (Dkt 1 at ¶¶ 95-96).

Mr. Ragbir's Amended Complaint, filed in the district court on July 19, 2018, describes additional examples of retaliation by ICE that have arisen since Plaintiffs filed this action, and even during the pendency of this appeal. A-0035 (ECF No. 100).

## II.    Procedural History

### A.    Proceedings Before the District Court

On February 9, 2018, Plaintiffs filed this action for declaratory, injunctive, and habeas relief, seeking review of Defendants' unlawful retaliation against Mr. Ragbir, the Coalition, and members of co-Plaintiff immigration advocacy organizations, in violation of the First Amendment. A-0074-76 (Dkt 1 at ¶¶ 125-37). In lieu of litigating a temporary restraining order, the government consented to a stay of Mr. Ragbir's removal, A-0019 (ECF No. 4), pending the district court's resolution of Plaintiffs' motion for a preliminary injunction, which Plaintiffs filed on February 12, 2018. A-0020 (ECF No. 11). In connection with that motion, Plaintiffs also moved for limited expedited discovery. A-0026 (ECF No. 40).

Defendants opposed Plaintiffs' preliminary injunction motion on March 7, 2018, attaching declarations from ICE New York Field Office Director Thomas Decker and Deputy Director Mechkowski. A-0028 (ECF No. 51). The declarations were not sworn or verified as correct under penalty of perjury. A-0148, A-0159-160 (Dkt 50 at 1, 12-13); A-0161, A-0172-73 (Dkt 51 at 1, 13).

Among other concessions, Mr. Decker and Mr. Mechkowski admitted that they knew about the public attention paid to Mr. Montrevil and Mr. Ragbir, that they surveilled Mr. Montrevil and Mr. Ragbir, and that they lied to counsel about their surveillance and when they decided to deport Mr. Ragbir. *See* A-0153-154 (Dkt 50 at ¶¶ 20-22) A-0164, A-0166-167 (Dkt 51 at ¶¶ 13, 20-22, 34).

The next day, Defendants sought leave to file an "amended declaration" of Mr. Decker. The amended declaration contained a different signature from the original declaration, *compare* A-0173 (Dkt 51 at 13) *with* A-0208 (Dkt 58 at 13) and made numerous substantive changes—among other things, it changed when, how, and why Mr. Ragbir's case came to Mr. Decker's attention, as well as who made the decision to deport Mr. Montrevil. *See* A-0185-186, 191 (Dkt 56-2 at 5-6, 11) (redline showing changes). Defendants later explained that Mr. Decker uses two different signatures and that he discovered inaccuracies in the original declaration after reviewing archived emails. A-0216-17 (Dkt 61 at 1-2); A-0242 (Dkt 63 at 1); A-0245 (Dkt 64 at 2). But the government never explained how the inaccuracies appeared in the original declaration in the first place. In response, Plaintiffs supplemented their request for expedited discovery, requesting leave, at a minimum, to depose Mr. Decker and review any documents the government had reviewed in connection with preparing Mr. Decker's two declarations. A-0026 (ECF No. 40). Defendants later filed a letter correcting an "incorrect" statement in

Mr. Mechkowski's declaration as well. A-0030 (ECF No. 68). The district court

denied Plaintiffs' request for discovery. A-0030 (ECF No. 69).

### B. The Decision Below

On May 23, 2018, without holding an evidentiary hearing or oral argument,

the district court dismissed "all claims … to declare unlawful and to enjoin

execution of Ragbir's final order of removal," and denied Plaintiffs' motion for a

preliminary injunction "insofar as it seeks to stay removal of plaintiff Ragbir." A-

0264, 282 (Dkt 83 at 2, 20). The district court did not dispute any of Plaintiffs'

factual contentions. To the contrary, the court "accepted as true" Plaintiffs'

allegations that Defendants "are executing the order of removal to silence [Mr.

Ragbir] and stifle his advocacy of immigrant rights." A-0277 (Dkt 83 at 15).

Instead, the district court based its ruling on two purely legal holdings. First,

the court held that 8 U.S.C. § 1252(g) eliminates federal courts' jurisdiction to

adjudicate any claim challenging the execution of a final removal order, including

constitutional claims that could not have been asserted in any other judicial or

administrative forum. A-0268-76 (Dkt 83 at 6-14). Second, the court held that it

need not decide whether § 1252(g)'s stripping of jurisdiction is constitutional as

applied to Plaintiffs' claims, because Mr. Ragbir "has no viable constitutional

claim." A-0278 (Dkt 83 at 16 n.8). The court reasoned that Mr. Ragbir's "asserted

injury flows from the final order of removal, which he does not allege is defective

or legally infirm." A-0291 (Dkt 83 at 3). In the court's view, just as "probable cause to arrest an individual defeats a claim asserting that the arrest was in retaliation for speech protected by the First Amendment," Mr. Ragbir's final removal order defeated his claim here. A-0277 (Dkt 83 at 15).

The court acknowledged that in *AADC*, the Supreme Court left open the possibility of a "case in which the alleged basis of discrimination is so outrageous" as to allow a constitutional defense to deportation notwithstanding 8 U.S.C. § 1252(g). *AADC*, 525 U.S. at 491; A-0279 (Dkt 83 at 17). The district court also acknowledged that in *Rajah*, 427, this Court held that targeting a noncitizen based on religious, ethnic, gender, or racial animus "would call for some remedy." 544 F.3d at 438; A-0280 (Dkt 83 at 18). But the district court "declined to extend" that holding, reasoning that "[m]embership in a targeted and protected group is not usually a volitional act, and, thus, traditionally immutable characteristics are not easily subject to strategic use by the person who is subject to a removal order." *Id.* In the district court's view, Mr. Ragbir's "decision to speak does not confer upon him an immunity from the enforcement of a pre-existing final order of removal"—

even where immigration officials decide to seek removal for the purpose of insulating themselves from public criticism. *Id.*[3]

## C.    Stay Proceedings

On May 25, 2018, Plaintiffs filed a notice of appeal, and on June 1, 2018, they moved for a stay of removal pending appeal. A-0286 (Dkt 84). While Plaintiffs' stay motion was pending, the Supreme Court issued its decision in *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018), which held—directly contrary to the district court's order issued three weeks earlier—that the existence of probable cause does *not* bar First Amendment retaliatory-arrest claims, at least where the retaliatory arrest is the product of "the existence and enforcement of an official policy motivated by retaliation." *Id.* at 1954-55.

Notwithstanding *Lozman*, on June 19, 2018, the district court denied a stay. A-0289 (Dkt 96). The court distinguished *Lozman* on the ground that "retaliation for speech cannot serve as a but-for cause of [Mr. Ragbir's] removal from the country because the order of removal was lawfully entered and was fully enforceable prior to the formation of the alleged retaliatory animus." A-0292 (Dkt 96 at 4). The court also reasoned that—even though Mr. Ragbir was present in this country with ICE's permission at the time of his attempted deportation—

---

[3] The court did not address Plaintiffs' claims seeking relief beyond an injunction against Mr. Ragbir's removal, which remain pending before the district court. A-0032 (Dkt 83 at 19).

"deportation is necessary in order to bring to an end *an ongoing violation* of United States law." *Id.* (quoting *AADC*, 525 U.S. at 491). As to irreparable harm, the court acknowledged that Plaintiffs' claims "sound plausible and even appealing," but concluded that—notwithstanding Mr. Ragbir's pending coram nobis proceedings—his removal is supposedly "inevitable," and thus "it is a matter of when, not if, these harms will occur." A-0293 (Dkt 96 at 5). The court also held that "[a]ny diminishment in the effectiveness of [Mr. Ragbir's] advocacy is an incident of his final order of removal," *id.*, even though the gravamen of Plaintiffs' claims is that immigration officials seek his deportation *because of* his speech. The court brushed aside as insufficient the fact that "there is no guarantee that [Mr. Ragbir] will be able to return to the United States." *Id.* Finally, the court found that the public interest weighed against a stay because "[t]he validity of Ragbir's removal has been tested repeatedly and upheld," even though none of those prior proceedings considered—let alone rejected—the retaliation claims at issue here. A-0295 (Dkt 96 at 7).

On July 3, 2018, Plaintiffs moved this Court for a stay of removal pending appeal. Appellant's Mot. For Stay of Removal, July 3, 2018, ECF No. 24. On July 19, 2018, Judge Hall issued a one-judge order granting a "temporary stay" and scheduling the stay motion for oral argument. Order, July 19, 2018, ECF No. 52. On August 15, 2018, after oral argument, the motions panel ordered expediting

briefing and oral argument and directed the parties to notify the Court immediately "in the event that the stay issued by the District Court for the District of New Jersey … is withdrawn or vacated before the pending appeal is heard." Order, Aug. 15, 2018, ECF No. 77.

## SUMMARY OF ARGUMENT

This Court should reverse and remand, for three reasons.

*First*, this lawsuit is the only way Plaintiffs can obtain judicial review of their First Amendment claims, and § 1252(g) does not and cannot bar any and all review of colorable constitutional claims. To the extent § 1252(g) does so, the provision as applied violates the Suspension Clause, the First Amendment, and Article III. But the Court need not address these questions, since § 1252(g) is best read not to apply to Plaintiffs' claims in the first place. To preclude judicial review of a colorable constitutional claim, Congress at a minimum must speak clearly. Yet § 1252(g) does not mention constitutional claims at all, and Plaintiffs' claims "aris[e] from" Defendants' retaliatory animus, not from any exercise of Defendant's legitimate discretion. The clear purpose of § 1252(g) was to preserve and (where possible) channel judicial review through the petition-for-review process, not to eliminate judicial review altogether.

*Second*, Plaintiffs' First Amendment claims here are more than colorable. Immigration officials are retaliating against protected core political speech, based

on the viewpoint expressed, pursuant to nationwide pattern and practice serving to insulate those same officials and their enforcement powers from public criticism. That is "outrageous" by any standard. *AADC*, 525 U.S. at 491. Holding otherwise would permit immigration officials to censor, punish, and compel noncitizen speech at will.

*Third*, the remaining relevant factors strongly favor a temporary stay of removal pending resolution of the merits of Plaintiffs' claims, or at least pending resolution of Plaintiffs' preliminary injunction motion on remand. Deportation will irreparably harm Mr. Ragbir by ripping him from his home and work, separating him from his family and community, and silencing his speech. It will also irreparably harm the Coalition by depriving it of its Executive Director and sole full-time employee. Whatever legitimate interest the government may have in executing Mr. Ragbir's removal order immediately, it pales in comparison to the harms Plaintiffs will suffer and the public interest in safeguarding the First Amendment.

## STANDARD OF REVIEW

This Court reviews legal questions of subject matter jurisdiction *de novo*, and factual findings relevant to subject matter jurisdiction for clear error. *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012).

# ARGUMENT

## I. The District Court Had Subject-Matter Jurisdiction over Plaintiffs' First Amendment Claims

The district court had subject-matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 because those claims "aris[e] under the Constitution, laws, or treaties of the United States"—in particular, under the First Amendment. The district court also had jurisdiction under the federal habeas statute, 28 U.S.C. § 2241. Congress, in 8 U.S.C. § 1252(g), did not and cannot constitutionally strip those bases of jurisdiction here and eliminate judicial review of colorable constitutional claims. And Plaintiffs' claims are more than colorable.

### A. Section 1252(g) Does Not and Cannot Constitutionally Bar All Judicial Review of Colorable Constitutional Claims

To the extent § 1252(g) purports to strip the district court of jurisdiction over colorable constitutional claims that cannot be heard in any other forum, the statute violates the Suspension Clause, the First Amendment, and the separation of powers. But the Court need not address those questions in this case, because § 1252(g) does not evince the necessary clear and convincing evidence of congressional intent to eliminate judicial review of constitutional claims.

*1.     § 1252(g) Is Unconstitutional as Applied if it Bars All Judicial Review of Colorable Constitutional Claims.*

The district court did not dispute that to the extent § 1252(g) eliminates all judicial review of a colorable constitutional claim, the statute is unconstitutional as applied. The court was correct not to contest that proposition; it is unassailable.

1. The Suspension Clause provides: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const., art. I, § 9, cl. 2. The federal habeas statute grants federal courts jurisdiction over habeas claims by a person "in custody under or by color of the authority of the United States." 28 U.S.C. § 2241(c)(1). It is well established that the "custody" necessary to invoke habeas jurisdiction is not limited to present physical imprisonment. Habeas instead extends to demands for release from all significant deprivations of liberty—including parole, *Jones v. Cunningham*, 371 U.S. 236, 240 (1963), release on personal recognizance, *Hensley v. Mun. Court*, 411 U.S. 345, 351 (1973), future confinement, *Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973), and restrictive conditions of confinement, *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008). Imminent removal is no different.

Indeed, the Supreme Court "has repeatedly held that habeas corpus is available to an alien seeking entry into the United States." *Jones*, 371 U.S. at 239 (citing cases). And this Court and three other circuits "have agreed that subjecting

an alien to a final order of removal is to place that alien in custody within the meaning of the habeas statute." *Simmonds v. INS*, 326 F.3d 351, 354 (2d Cir. 2003) (citing cases); *accord Ogunwomoju v. United States*, 512 F.3d 69, 74 n.8 (2d Cir. 2008) (reiterating that holding after the enactment of the REAL ID Act). That conclusion is correct. Although a deported noncitizen may be "free to go anywhere else in the world," *Jones*, 371 U.S. at 239, banishment from this country by its very nature entails an immense restriction on a person's liberty.

The habeas statute and the Suspension Clause also encompass Mr. Ragbir's cause of action here. "Traditionally, habeas review … ha[s] encompassed … constitutional claims." *Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 327 (2d Cir. 2006). And Mr. Ragbir is not merely employing constitutional "rhetoric." *Id.* at 329-30, 332. He has asserted well-established claims of genuine constitutional dimension—retaliation in violation of the First Amendment. *See, e.g.*, *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

To be sure, "'[t]he substitution of a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention' does not violate the Suspension Clause." *INS v. St. Cyr*, 533 U.S. 289, 314 n.38 (2001) (quoting *Swain v. Pressley*, 430 U.S. 372, 381 (1977)). But neither the district court nor Defendants have ever identified any mechanism other than this lawsuit through which Mr. Ragbir could obtain effective judicial review of his

constitutional claims. The only other mechanism the district court and Defendants have even mentioned is a petition for review to this Court under 8 U.S.C. § 1252(a)(5). *E.g.*, A-0273 (Dkt 83 at 11). But that option is not available here, because a petition for review "must be filed not later than 30 days after the date of the final order of removal," 8 U.S.C. § 1252(b)(1), and the basis for Mr. Ragbir's claims here did not arise until a *decade* after his removal order became final.[4]

Numerous federal courts have recognized that a petition for review is ineffective to review claims that arise after a removal order becomes final, and have exercised habeas jurisdiction over such claims for that reason.[5] And this Court has twice read § 1252(g) to avoid the grave Suspension Clause questions that

---

[4] Even if Mr. Ragbir's claims had arisen earlier, the government has long taken the position that IJs and the BIA lack authority to hear claims like these, *see* U.S. Br., *AADC*, 525 U.S. 471 (1999), 1998 WL 411431, at *38, so resort to administrative proceedings would have been futile. For the same reason, when adjudicating a subsequent petition for review, this Court would have lacked an adequate factual record on which to evaluate Plaintiffs' First Amendment claims. *See* 8 U.S.C. § 1252(a)(1) (barring a court hearing a petition for review from "order[ing] the taking of additional evidence").

[5] *See, e.g.*, *Jama v. INS*, 329 F.3d 630, 632-33 (8th Cir.), *aff'd sub nom Jama v. ICE*, 543 U.S. 335 (2005) (finding habeas jurisdiction to review challenge to ICE's adherence to mandatory post-order statutory requirements); *Singh v. Gonzales*, 499 F.3d 969 (9th Cir. 2007) (finding habeas jurisdiction over claim based on post-order ineffective assistance of counsel); *Devitri v. Cronen*, 289 F. Supp. 3d 287, 294 (D. Mass. 2018) (finding habeas jurisdiction to stay removal to allow noncitizens to pursue motions to reopen their immigration proceedings based on post-order changed circumstances), *appeal filed* (1st Cir. Feb. 1, 2018); *Hamama v. Adducci*, 261 F. Supp. 3d 820 (E.D. Mich. 2017) (same); *see also Luna v. Holder*, 637 F.3d 85, 97-104 (2d Cir. 2011) (discussing requirements for an adequate and effective substitute for habeas jurisdiction).

would arise if a noncitizen could not raise a colorable claim either via a petition for review or a habeas petition. *See Calcano-Martinez v. INS*, 232 F.3d 328, 340-42 (2d Cir. 2000), *aff'd* 533 U.S. 348 (2001); *Ruiz-Martinez v. Mukasey*, 516 F.3d 102, 113-17 (2d Cir. 2008).

This Court's decision in *Duamutef v. INS*, 386 F.3d 172 (2d Cir. 2004), which the government cited in its stay opposition to this Court, is not to the contrary. *Duamutef* involved a noncitizen state prisoner who had received "Conditional Parole for Deportation Only"; his habeas claim sought to compel INS to cease delaying, retrieve him from state custody, and deport him. *Id.* at 174-76. This Court expressly declined to decide the "complicated question of whether Duamutef [wa]s in INS custody," and resolved the case on a separate, "more straightforward jurisdictional basis." *Id.* at 178. While the Court expressed doubts about whether Duamutef's removal order alone "answer[ed] the specific custody question presented," that is because his unusual claim was not *challenging* the custody inherent in his future removal, but instead seeking to *accelerate* it. *Id.* Mr. Ragbir, by contrast, unquestionably is challenging the custody inherent in his retaliatory removal.[6]

---

[6] *Ogunwomoju*, the other custody case the government cited in its stay opposition is, if anything, even more inapposite. The Court there held only that immigration detention is not "custody *pursuant to the judgment of a State court*" under 28 U.S.C. § 2254. 512 F.3d at 73.

2.  Independent of the Suspension Clause, reading § 1252(g) to bar review of colorable First Amendment claims would violate the First Amendment itself.  This Court faced a similar issue in *Battaglia v. General Motors Corp.*, 169 F.2d 254 (2d Cir. 1948), which concerned a jurisdictional provision of the Portal-to-Portal Act purporting to strip federal courts of jurisdiction to entertain a due process challenge to the Act's substantive provisions.  This Court upheld the jurisdiction-stripping provision while making clear that if the substantive provisions had been unconstitutional, then the jurisdiction-stripping provision would have been as well. *Id.* at 257-59.   In the Court's words, "while Congress has the undoubted power to give, withhold, and restrict the jurisdiction of courts other than the Supreme Court, it must not so exercise that power as to deprive any person of life, liberty, or property without due process of law or to take private property without just compensation."  *Id.* at 257 (footnote omitted).

In the same way in this case, when defining the jurisdiction of federal courts, Congress also "shall make no law … abridging the freedom of speech."  U.S. Const., am. I.  Yet if applied here, § 1252(g) would be just such a law, stripping Plaintiffs' of any remedy whatsoever for a blatant First Amendment violation. *Battaglia* correctly recognized that that kind of "total denial of any remedy, in either the state or federal courts, [i]s not a mere regulation of jurisdiction," but an unconstitutional denial of a substantive right.  Henry M. Hart, Jr., *The Power of*

*Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L. Rev. 1362, 1383 (1953).

3.  If applied to strip all federal jurisdiction over colorable constitutional claims, § 1252(g) also violates Article III.  Article III provides that "[t]he judicial power shall extend to all cases, in law and equity, arising under th[e] Constitution."  U.S. Const., art. III, § 2.  These cases are of a special status—they "enter into the national policy, affect the national rights, and may compromit the national sovereignty."  *Martin v. Hunter's Lessee*, 14 U.S. 304, 335 (1816).  Federal jurisdiction over such cases thus "ought not … to be restrained, but should be commensurate with the mischiefs intended to be remedied, and, of course, should extend to all cases whatsoever."  *Id.*

Indeed, as one leading scholar has explained, "[w]ith respect to cases arising under the Constitution, the need for mandatory jurisdiction was manifest" in the Constitutional Convention and ratification debates.  Akhil Amar, *A Neo-Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction*, 65 B.U.L. Rev. 205, 246-47 (1985).  To ensure the Constitution's status as the supreme law of the land, it plainly "would have been insufficient simply to empower, but not oblige, Congress to give federal courts jurisdiction in these cases."  *Id.* at 250.  There is and must be federal jurisdiction over colorable constitutional claims.

## 2. Congress Did Not Clearly Intend § 1252(g) to Bar All Judicial Review of Colorable Constitutional Claims

1.  This Court need not answer these grave constitutional questions in this case, however, because § 1252(g) is best read not to apply to Plaintiffs' claims here in the first place. "[W]here Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). "[T]his heightened showing" is required "in part to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* (internal quotation marks omitted).

Here, § 1252(g) lacks the "clear and convincing evidence" of congressional intent necessary to bar review of Mr. Ragbir's constitutional claims. *Johnson v. Robison*, 415 U.S. 361, 373 (1974) (internal quotation marks omitted). Beginning with the statutory text, § 1252(g) does not even mention "constitutional" claims. Other provisions of § 1252, by contrast, expressly cover "constitutional" challenges. *See* 8 U.S.C. § 1252(a)(2)(D), (b)(9), (e)(3)(A)(i). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (brackets and quotation marks omitted).

Section 1252(g) also limits federal courts' jurisdiction only over claims "arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders."  Courts construe this language "narrow[ly]."  *AADC*, 525 U.S. at 486.  In *AADC*, the Supreme Court "did not interpret this language to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General.  Instead, [the Court] read the language to refer to just those three specific actions themselves." *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (plurality op.).  Likewise, when construing similar language in § 1252(b)(9), the plurality in *Jennings* "eschewed uncritical literalism leading to results that no sensible person could have intended." *Id.* at 840.

Following that guidance, the Ninth Circuit—even when there was no need to avoid any grave constitutional question—has "limit[ed] § 1252(g)'s scope to discretionary decisions that the Attorney General actually has the power to make, as compared to the violation of his mandatory duties."  *Arce v. United States*, -- F.3d --, 2018 WL 3763524, at *4 (9th Cir. Aug. 9, 2018).  That court thus held that a damages suit challenging the deportation of a noncitizen in violation of a judicial stay arose "not from the execution of the removal order, but from the violation of [a] court's order."  *Id.* at *3.  So too here, Plaintiffs' claims arise not from the

execution of Mr. Ragbir's removal order, but from immigration officials' unlawful decision to retaliate against protected speech.

Even where the language of § 1252(g) applies, moreover, it contains an exception—"except as provided in this section." And the rest of § 1252 expressly preserves noncitizens' right to seek judicial review—including "review of constitutional claims or questions of law"—via a petition for review. That structure evinces a clear congressional intent to *preserve* judicial review of constitutional claims, not to eliminate it. Read in context, § 1252(g) serves to "channel[] judicial review of … some decisions and actions" into a single proceeding before a court of appeals. *AADC*, 525 U.S. at 483 (emphasis omitted). Even the government in *AADC* "characterized [§ 1252(g)] as 'a channeling provision, requiring aliens to bring all deportation-related claims in the context of a petition for review of a final order of deportation filed in the court of appeals.'" *Id.* at 478 (quoting Government brief). The district court thus plainly erred in stating that "section 1252(g) does not read as a channeling provision." A-0273 (Dkt 83 at 11).

*AADC* implicitly acknowledged the force of Plaintiffs' statutory argument here. The noncitizen plaintiffs in *AADC* argued that "the doctrine of constitutional doubt require[d] [the Court] to interpret § 1252(g) in such a fashion as to permit immediate review of their selective-enforcement claims." 525 U.S. at 488. The

Court rejected that argument on the ground that the plaintiffs there had no valid claim. *Id.* The Court did not dispute, however, that the avoidance canon *would* require interpreting § 1252(g) to allow effective review of colorable constitutional claims, or that the statute was indeed susceptible to such an interpretation. And again, this Court has twice interpreted § 1252(g) in ways it might not have otherwise to avoid denying noncitizens any judicial forum for colorable claims. *See Calcano-Martinez*, 232 F.3d at 340-42 (2d Cir. 2000); *Ruiz-Martinez*, 516 F.3d at 113-17; *supra* p.26.

2. In reaching a contrary conclusion, the district court reasoned that "[c]onstruing section 1252(g) as inapplicable to claims that arise after the final order of removal … is … inconsistent with the [provision's] apparent purpose," because "[i]t is not plausible that Congress designed section 1252(g) to cover only the execution of a removal order before the order became final" when "before the order became final, it could not be executed." A-0273-274 (Dkt 83 at 11-12). That misconstrues Plaintiffs' argument. Plaintiffs have never contended that § 1252(g) "cover[s] only the execution of a removal order before the order became final." That indeed would make no sense. Plaintiffs instead contend that § 1252(g) does not apply to colorable constitutional claims arising from the violation of a mandatory, non-discretionary duty after a removal order becomes final. Such claims do not implicate Congress's core concerns with channeling

judicial review—where possible—to the petition-for-review process, and affording immigration officials discretion to balance legitimate enforcement priorities against humanitarian and other reasons for forbearance. In that circumstance, given *Webster*'s clear statement rule and *AADC*'s direction to construe § 1252 narrowly, the statute does not apply.

The district court also relied on *Duamutef*, A-0274 (Dkt 83 at 12), but again, that case is inapposite. As noted, *Duamutef* involved an unusual claim seeking to accelerate a noncitizen's removal. This Court dismissed that claim principally on the ground that immigration authorities were "under no obligation"—statutory or constitutional—"to execute [his] deportation order." 386 F.3d at 179-80. In the alternative, the Court dismissed the petitioner's mandamus claim under § 1252(g), but the Court never mentioned, let alone analyzed, the avoidance canon, when the claim arose, § 1252(g)'s channeling function, or whether finding no jurisdiction would preclude any and all judicial review of a colorable constitutional claim. *Id.* at 180-81. None of that is surprising given that the Court had already explained that Duamutef's constitutional claims were non-colorable. *Duamutef* thus simply did not consider or address the arguments Plaintiffs raise here.[7]

---

[7] The district court below never addressed Defendants' argument below that the court also lacked jurisdiction under 8 U.S.C. § 1252(b)(9). This Court need not address that argument in the first instance, *see CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 78-79 (2d Cir. 2017), but if it does, the Court should

(Footnote Cont'd on Following Page)

**B.      Plaintiffs' First Amendment Claims Are Colorable**

In order to establish the district court's subject-matter jurisdiction and prevail on this appeal, Plaintiffs need only show that their First Amendment claims are "colorable." *Webster*, 486 U.S. at 603. Plaintiffs have shown far more than that. The district court "accepted as true" Plaintiffs' factual contentions, and it is difficult to conceive a more egregious First Amendment violation than immigration officials seeking to deport a noncitizen pursuant to a pattern and practice of retaliating against core political speech criticizing those same officials and their powers.

> ### 1.      *The Government's Retaliation against Public Criticism Here Is an "Outrageous" Violation of the First Amendment*

1. "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). It does not matter whether the speaker otherwise has an independent "right" to be free from the adverse action taken by the government. Even if the government could lawfully take adverse action against an individual,

---

(Footnote Cont'd From Previous Page)
reject it. All of § 1252(b), including (b)(9), "applies only '[w]ith respect to review of an order of removal under subsection (a)(1).'" *St. Cyr*, 533 U.S. at 313 (quoting § 1252(b)) (alteration in original). Plaintiffs are not seeking review of Mr. Ragbir's removal order, but of Defendants' decision to retaliate against protected speech. And "cramming judicial review of [Plaintiff's post-order claims] into the review of [Mr. Ragbir's] final removal order[] would be absurd." *Jennings*, 138 S. Ct. at 840 (plurality op.).

for "any number of [other] reasons," the government may not do so "because of his constitutionally protected speech or associations." *Perry*, 408 U.S. at 597. Put simply, the government "may not retaliate for exercising First Amendment speech rights." *Wilkie v. Robbins*, 551 U.S. 537, 555 (2007).

The Supreme Court has held that a wide range of retaliatory actions violate the First Amendment. In *Board of County Commissioners v. Umbehr*, 518 U.S. 668 (1996), for example, the Supreme Court held that a local government's termination of a trash hauler's contract on the grounds that he was an "outspoken critic" of the local government violated the First Amendment. *Id.* at 671, 685. The Supreme Court and the courts of appeals have held that even *threatening* to institute retaliatory criminal proceedings violates the First Amendment. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68-72 (1963); *e.g.*, *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230-31 (7th Cir. 2015). Such retaliatory actions are prohibited because allowing them would permit the government to punish speech indirectly, when the government has no right to punish speech at all. *See Perry*, 408 U.S. at 597-98.

2. Defendants' retaliatory actions here strike at the very heart of the First Amendment prohibition against retaliation, in three ways. First, the expression Defendants have targeted here concerns the wisdom and justice of our immigration system, a matter of intense public concern. "[S]peech on public issues occupies

- 36 -

the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (internal quotation marks omitted). Indeed, Mr. Ragbir's and the Coalition's speech involves "the type of interactive communication concerning political change that is appropriately described as 'core political speech,'" *Meyer v. Grant*, 486 U.S. 414, 422 (1988), where "First Amendment protection is at its zenith." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 183 (1999).

Second, Defendants have retaliated against Mr. Ragbir and the Coalition based on the content and viewpoint of their speech. Government actions that restrict speech "based on its communicative content" are "presumptively unconstitutional." *Nat'l Inst. of Family & Life Advocates v. Becerra ("NIFLA")*, 138 S. Ct. 2361, 2371 (2018). And Defendants here have targeted speech based not just on its content, but its viewpoint—a particularly "egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* Such viewpoint discrimination is always unconstitutional. *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011). The retaliatory actions here thus violate "the fundamental principle that governments have no

power to restrict expression because of its message, its ideas, its subject matter, or its content." *NIFLA*, 138 S. Ct. at 2371 (quotation marks omitted).

Third, Defendants have retaliated against Mr. Ragbir and the Coalition pursuant to an official policy, embodied in a nationwide pattern and practice. "An official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer." *Lozman*, 138 S. Ct. at 1954. "An official policy also can be difficult to dislodge," since "there may be little practical recourse when the government itself orchestrates the retaliation." *Id.* "For these reasons, when retaliation against protected speech is elevated to the level of official policy, there is a compelling need for adequate avenues of redress." *Id.*

3. While the Supreme Court in *AADC* held "[a]s a general matter" that noncitizens have "no constitutional right to assert selective enforcement as a defense against [their] deportation," the Court carefully preserved "the possibility of a rare case in which the alleged basis of discrimination is so outrageous" as to allow such a defense. 525 U.S. at 491. And in *Rajah*, this Court made clear that *AADC*'s exception for "outrageous" discrimination is not merely theoretical. Confronted with allegations of discrimination based on noncitizens' "religion, ethnicity, gender, and race," this Court expressly "agree[d]" that "a selective

prosecution based on an animus of that kind would call for some remedy." 544
F.3d at 438.

Here, it is "outrageous" for immigration officials to seek to banish a leading
activist from this country, based on public criticism of those same officials and
their powers, pursuant to a widespread retaliatory pattern and practice. This Court
in *Rajah* recognized certain forms of discrimination as "outrageous" because they
violate a basic tenet of our democracy—that religious, ethnic, gender, and racial
differences have no valid bearing on a person's dignity or status. The retaliation
here violates an equally "fundamental" principle—the "right of free public
discussion of the stewardship of public officials." *N.Y. Times Co. v. Sullivan*, 376
U.S. 254, 274-75 (1964). Indeed, "[t]he freedom of individuals verbally to oppose
or challenge police action without thereby risking arrest is one of the principal
characteristics by which we distinguish a free nation from a police state." *City of
Houston v. Hill*, 482 U.S. 451, 462-63 (1987).

Defendants' retaliation here, moreover, is calculated to chill public debate
and insulate immigration officials and the laws and policies they enforce from
public criticism and democratic accountability. To some extent, they are
succeeding in that aim. In the wake of Mr. Ragbir's detention and Mr. Montrevil's
deportation, citizens and noncitizens alike are increasingly reluctant to participate
in the Coalition's activities out of fear of retaliation by ICE. A-0070 (Dkt 1

¶¶ 109-10).  Other co-Plaintiff immigration advocacy organizations have had to

overhaul their programs to respond to frequent inquiries from noncitizens about the

risks of participating in rallies and other protected political expression.  A-0085-87

(Dkt 13 at 5-7); A-0096-97 (Dkt 14 at 7); A-0103 (Dkt 15 at 5); A-0114 (Dkt 16 at

5).  Immigration officials "can't deport a movement," Ruth Weissman & Anna

Sander, *Rally Held as Immigrant Activist Granted Deportation Stay*, N.Y. Post

(Feb. 10, 2018), https://nyp.st/2wdRu7p, but they can and have chilled public

debate.

And if the decision below stands, Defendants' actions to date are just some

of the many ways immigration officials could freely manipulate public discourse.

For example, ICE could insert express non-disparagement clauses in every Order

of Supervision, barring noncitizens on pain of deportation from criticizing any ICE

official, deportation policy, or immigration law.  Using the same threat of

deportation, immigration officials could even compel noncitizens to voice public

support for ICE, for pending legislation, or for a particular candidate in an

upcoming election.  Under the decision below, these actions—as well as any other

action immigration officials might take against the speech of noncitizens with final

removal orders—would be completely immune from judicial review.  Even worse,

on the merits, these actions would be constitutional.  So if ICE were to ask its own

lawyers or the Department of Justice's Office of Legal Counsel whether there is

any constitutional bar to deporting a particular noncitizen solely and exclusively in retaliation for, say, attending a Coalition-organized rally, the answer under the decision below would be that such action fully complies with the First Amendment. That is not and cannot be the law.

4. The district court acknowledged that under this Court's decision in *Rajah*, similarly outrageous deportations based on religious, ethnic, gender, or racial discrimination "would call for some remedy," 544 F.3d at 438, but the district court "decline[d] to extend" that holding to retaliation against protected core political speech. A-0280 (Dkt 83 at 18). The district court reasoned that speech is a "volitional act," unlike "[m]embership in … targeted and protected group[s]," which are defined by "traditionally immutable characteristics … not easily subject to strategic use." *Id.* This purported distinction fails on every level.

To begin with, this distinction proves too much. The district court's rationale would bar *any* First Amendment claim for unconstitutional deportation. Yet it was in the context of a First Amendment claim in particular that the Supreme Court in *AADC* first indicated that deportation on an "outrageous" basis would be unconstitutional. 525 U.S. at 491.

In *Rajah*, moreover, not all of the characteristics at issue were truly "immutable." The noncitizens there alleged religious discrimination, and individuals can and often do change their religious affiliations. To be sure, as the

BIA has long recognized in the context of asylum claims, religious affiliation is immutable in the sense that it is "a characteristic that either is beyond the power of an individual to change or is so fundamental to individual identity or conscience that it ought not be required to be changed." *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985). When used in that sense, however, "political opinion" *also* is immutable. *Id.* Voicing a political opinion indisputably is a voluntary act—the would-be speaker can choose literally to "mute" him- or herself. But the whole premise of the First Amendment is that the government cannot use the threat of reprisal to compel individuals to silence themselves.

Furthermore, just because noncitizens theoretically *can* engage in "strategic" political speech does not mean there is any reasonable basis to believe they will. To begin with, publicly criticizing ICE carries the immense risk of antagonizing the same officials who hold noncitizens' fates in their hands. The upside benefit, moreover, is extremely limited. If a retaliation claim succeeds—the best-case scenario—the noncitizen does not necessarily gain permanent or even long-term authorization to remain in this country.

More fundamentally, manufactured retaliation claims will fail. That is because at most, a noncitizen could manufacture only one element of a multi-element claim—engaging in protected speech. Noncitizens cannot manufacture a basis to believe that immigration officials chose to deport the noncitizen *in*

*retaliation for* that speech. A hypothetical noncitizen who engaged in "strategic" political speech thus would be situated no better than the unsuccessful petitioners in *Rajah*, or any other member of a traditionally disadvantaged group. A substantial proportion of noncitizens with final orders of removal—perhaps even a majority—are members of traditionally disadvantaged groups, against whom discrimination is already "outrageous" under *Rajah*. Since *Rajah*, however, this Court has not seen any flood of manufactured selective removal claims. That is because it is generally impossible to manufacture evidence that immigration officials took action *because of* a protected characteristic, immutable or otherwise.

For these reasons, Plaintiffs' retaliation claims here bear no resemblance to "pro-democracy claims" for asylum from China, which noncitizen can potentially "manufacture" by "writ[ing] something supportive of democracy … and publish[ing] it in print or on the Internet." *Y.C. v. Holder*, 741 F.3d 324, 338 (2d Cir. 2013). Unlike publicly criticizing ICE, writing about Chinese democracy carries little risk of antagonizing the *American* government. And unlike a retaliation plaintiff, a successful asylum applicant can gain lawful permanent resident status in the United States. *See* 8 U.S.C. § 1159. Yet even in the setting of pro-democracy asylum claims, this Court has dealt with the possibility of manufactured claims not by barring or limiting the whole category of claims, but by reviewing them carefully. *See Y.C.*, 741 F.3d at 338. And here, there is no

evidence—or even any allegation—that Mr. Ragbir's and the Coalition's protected core political speech publicly criticizing ICE is anything other than sincere. Plaintiffs' retaliation claims are genuine, and there is no basis to believe that manufactured claims by hypothetical future plaintiffs will ever succeed.

### 2. *Mr. Ragbir's Final Removal Order Does Not Defeat Plaintiffs' Retaliation Claims*

Plaintiffs here do not dispute the general validity of Mr. Ragbir's removal order. Plaintiffs' claims stem not from the removal order itself, but from immigration officials' retaliatory decision to weaponize that order to punish and deter Mr. Ragbir's and the Coalition's protected speech. If Defendants had decided, without regard for Mr. Ragbir's and the Coalition's protected activism, that legitimate enforcement priorities outweighed any humanitarian or other reasons for continued forbearance, and had deported Mr. Ragbir in accordance with standard procedures just like any other noncitizen, Plaintiffs would have no claim. Plaintiffs have a claim because that is *not* what happened here.

The district court erred in concluding that retaliatory removal categorically *cannot* violate the First Amendment because the "asserted injury flows from the final order of removal." A-0277-278 (Dkt 83 at 15-16). In support of this view, the district court relied on cases holding that the existence of probable cause will defeat a First Amendment claim for retaliatory arrest or prosecution. *Id.* at A-0277-279.

Notwithstanding that the retaliatory execution of a final order of removal is distinguishable from a retaliatory arrest or prosecution (most fundamentally because it is non-criminal), the Supreme Court's recent decision in *Lozman* eviscerates the district court's reasoning. *Lozman* holds that the existence of probable cause does *not* bar First Amendment retaliatory-arrest claims, at least where the arrest is the product of "the existence and enforcement of an official policy motivated by retaliation." 138 S. Ct. at 1954-55. That is precisely the situation here. Plaintiffs squarely allege that Mr. Ragbir's deportation was part of a widespread pattern and practice of targeting critics for removal and other immigration enforcement actions. A-0060 (Dkt 1 at ¶ 78). Thus, even if the district court were correct that arrest and removal *are* analogous (and they are not), *Lozman* holds that individuals in *both* circumstances may bring First Amendment retaliation claims.

*Lozman* also limits the Supreme Court's prior holding in *Hartman v. Moore*, which held that the existence of probable cause defeats a claim for retaliatory prosecution. 547 U.S. at 252. Retaliatory prosecution claims cannot be brought against prosecutors, who are absolutely immune, and instead must be brought against "some other government official" who "induced the prosecutor to bring charges that would not have been initiated without his urging." 138 S. Ct. at 1953. *Lozman* explains that, in that context, "prov[ing] the lack of probable cause …

- 45 -

help[s] bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action." *Id.* at 1953. This case, of course, involves no such "gap." Plaintiffs here have sued all of the relevant decisionmakers, all of whom are subject to suit.

The district court's attempt to distinguish *Lozman* fails. In denying a stay, the court reasoned that Mr. Ragbir's deportation "is necessary in order to bring to an end *an ongoing violation* of United States law." A-0292 (Dkt 96 at 4). But arrest too is often necessary to end an ongoing criminal violation. And here, between the time when he became a lawful permanent resident in 1994 and when Defendants attempted to deport him in retaliation for protected speech in January of this year, Mr. Ragbir has never been present in the United States without the U.S. government's express authorization.

The district court also reasoned that because his removal order was issued "prior to the formation of the alleged retaliatory animus," Mr. Ragbir categorically cannot show that retaliation was the but-for cause of his removal. A-0292 (Dkt 96 at 4). In its stay opposition to this Court, the government did not even attempt to defend that reasoning, which ignores the very gravamen of Plaintiffs' claims. Plaintiffs brought this case precisely because protected speech *was* the but-for cause of the government's decision to execute the removal order against Mr. Ragbir. To that end, Plaintiffs have alleged and shown a clear causal connection

between Mr. Ragbir's and the Coalition's protected speech and Defendants' decision to execute the removal order against Mr. Ragbir. And to satisfy their burden of showing but-for causation, Plaintiffs need only demonstrate that the protected speech "was a substantial or motivating factor behind" Defendants' actions; it is then *Defendants*' burden to show that they would have taken the same actions regardless, "without respect to retaliation." *Lozman*, 138 S. Ct. at 1952.

Again, the district court "accepted as true" Plaintiffs' factual contentions. A-0277 (Dkt 83 at 15). That was for good reason. The government's declarations are neither sworn nor verified under penalty of perjury, and thus are not evidence of anything. *See* 28 U.S.C. § 1746; *In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 488 (2d Cir. 2013). The government also had to correct one declaration, and substantially amend the other, including regarding critical facts about how, when, and why Defendants' decided to deport Mr. Ragbir. Moreover, the district court denied Plaintiffs' requests for discovery, and did not hold an evidentiary hearing. To the extent this Court has any doubts about whether Mr. Ragbir's and the Coalition's protected speech are the but-for cause of Defendants' attempts to remove Mr. Ragbir, the only proper course is to reverse and remand, enter a temporary stay, and allow the district court to evaluate the parties' evidence in the first instance.

## II.    The Remaining Factors Heavily Favor Preliminary Relief

In the decision under review on this appeal, the district court did not address any of the preliminary injunction factors beyond likelihood of success on the merits.  But the district court did address irreparable harm, the balance of equities, and the public interest in its order denying a stay pending appeal.  This Court should correct the district court's misapplication of those factors now.  Doing so will avoid piecemeal litigation and forestall having the district court immediately and erroneously deny a preliminary injunction on remand on grounds this Court can easily foresee and correct preemptively.

### A.    Plaintiffs Will Suffer Irreparable Harm Absent Relief

#### 1.    *Mr. Ragbir Will Suffer Irreparable Harm if He Is Deported*

1.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Thus, in cases involving specific and direct restrictions on speech, "the irreparable nature of the harm may be presumed." *Bronx Household of Faith v. Bd. of Educ. of the City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003).

Mr. Ragbir faces the imminent, irreparable, and indefinite loss of his First Amendment freedom to express his views on the U.S. immigration system.  Unless this Court grants relief, Mr. Ragbir will be deported to Trinidad as a direct result of his comments about Defendants' immigration policies.  Mr. Ragbir has spent more

than a decade advocating for immigrants' rights in the United States. His

impending removal from this country will stifle this speech by frustrating his

ability to effectively express his views on U.S. immigration policy. At oral

argument before the motions panel on Plaintiff's stay motion, government counsel

could not represent that ICE would wait even "one day" after any stay dissolves

before immediately banishing Mr. Ragbir from this country. Oral Argument

Regarding Plaintiffs' Motion for Stay at 29:00-29:30 (August 14, 2018) ("Oral

Arg.").

In analogous circumstances, the Supreme Court has held that restrictions that

render speech less effective—even if speech is not banned altogether—may

impermissibly burden expression. In *McCullen v. Coakley*, 134 S. Ct. 2518

(2014), for example, the Court invalidated a law imposing a buffer zone around

abortion clinics. The law did not prohibit the plaintiffs—individuals who sought to

counsel women on alternatives to abortion—from speaking. *Id.* at 2527-29. But

the law rendered their speech "far less frequent" and "far less successful" by

preventing them from engaging in personal conversations with the women they

wished to counsel. *Id.* at 2537. The loss of these "primary methods" of expression

"effectively stifled" the plaintiffs' speech. *Id.* at 2536-37; *see also Sorrell*, 564

U.S. at 564; *Davis v. FEC*, 554 U.S. 724, 736-40 (2008).

So too here.  Mr. Ragbir's presence in the United States is essential to his ability to effectively convey his ideas and views about U.S. immigration law and policy.  Mr. Ragbir expresses his opinions and effects change within the immigrant community through meetings with elected officials, presentations at conferences and media events, and by visiting and speaking out at places of worship.  Absent preliminary relief, Mr. Ragbir will lose all of these avenues for expression.  It is "no answer" to say that Mr. Ragbir can continue to voice his opinions about U.S. immigration policy from outside the United States.  *McCullen*, 134 S. Ct. at 2537. That mode of expression is no substitute for the direct contact and exchange that is essential to Mr. Ragbir's advocacy and speech.  The harm Mr. Ragbir faces is not just a chill on his protected speech, but also a deprivation of his ability to engage in effective and meaningful speech in support of immigrant rights in the United States.  *Cf. Bronx Household of Faith*, 331 F.3d at 349.

Contrary to the district court's suggest, this deprivation is not a mere "incident of his final order of removal."  A-0293 (Dkt 96 at 5).  The crux of Mr. Ragbir's claims is that Defendants are attempting to remove him from the United States now for the very *purpose* of diminishing the effectiveness of his advocacy— to silence him.  This specific and imminent deprivation of his ability to engage in protected political speech "unquestionably constitutes irreparable injury."  *Elrod*, 427 U.S. at 373.

2. Deportation will inflict other irreparable harms on Mr. Ragbir as well. "[R]emoval is a serious burden for many aliens," *Nken*, 556 U.S. at 435, involving the "enormous hardship" of being wrenched from their communities and families, *Kalaw v. Ferro*, 651 F. Supp. 1163, 1167 (W.D.N.Y. 1987). Mr. Ragbir has not lived in Trinidad for decades. If deported, he faces the prospect of indefinite separation from his U.S. citizen wife and daughter, and the relinquishment of his life's work as an immigrant-rights activist in the United States. The trauma of deportation also would inflict lasting psychological harm. *Cf. Chalk v. U.S. Dist. Court Cent. Dist.*, 840 F.2d 701, 709 (9th Cir. 1988); *Vencor Nursing Ctrs., L.P. v. Shalala*, 63 F. Supp. 2d 1, 12 (D.D.C. 1999). All of these injuries are severe and irreparable.

The district court reasoned that because of Mr. Ragbir's final order of removal, his deportation is "inevitable" and "[t]he harm flowing from removal now versus an unspecified point in the future is … abstract." A-0293 (Dkt 96 at 5). But Defendants are "under no obligation to execute [Mr. Ragbir's] deportation order." *Duamutef*, 386 F.3d at 179-80. If Defendants are barred from deporting Mr. Ragbir in retaliation for protected speech, there is no telling how long he may remain here. And if he prevails on his pending coram nobis petition, motion to reconsider or reopen, or application for adjustment of status, he may regain his status as a lawful permanent resident.

The district court found it insufficient that "there is no guarantee that [Mr. Ragbir] will be allowed to return to the United States in the event he succeeds on appeal and then on the merits of his claims," reasoning that "were the bar for establishing harm so low, the execution of most final and fully reviewed orders of removal would likely meet the standard." A-0294 (Dkt. 96 at 6). But even the Supreme Court in *Nken* recognized that removal presents a "serious burden" for most aliens; the Supreme Court's holding that the burden alone did not establish irreparable harm rested on the Government's representations that petitioners who ultimately prevailed on a petition for review from a final removal order "can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal." *Nken*, 556 U.S. at 435. Those representations have since been discredited—there was no such policy. *See* Letter from Michael R. Dreeben, Deputy Solicitor Gen., U.S. Dep't of Justice, to Hon. William K. Suter, Clerk, Supreme Court of the U.S. 3-4 (Apr. 24, 2012), https://goo.gl/2zmv6B; *Kabenga v. Holder*, 76 F. Supp. 3d 480, 487 (S.D.N.Y. 2015) (granting stay of removal and noting that the government's representations in *Nken* have "proved illusory").

In this case, moreover, the government has made quite clear that it will *not* facilitate Mr. Ragbir's return if he prevails on the merits. At oral argument on the stay motion, government counsel stated that he "cannot represent to the Court" that

if Mr. Ragbir prevails, he will be … allowed to return." Oral Arg. at 30:20-31:00.

Government counsel also made clear that the return policy ICE announced in the

aftermath of *Nken* does not apply to suits, like this one, brought in district court

rather than via a petition for review. *Id.* at 31:20-31:40; *see* ICE, *Facilitating the*

*Return to the United States of Certain Lawfully Removed Aliens* 1 (Feb. 24, 2012),

https://goo.gl/vbPkox; *see also* A-0139 -140 (Dkt 18 ¶ 14]] (explaining based on

recent experience that "federal courts should not rely on any reassurance by ICE

that it will facilitate" a noncitizen's return). If ICE is allowed to deport Mr.

Ragbir, there is every indication that he will never come back, regardless of the

outcome of this lawsuit.

    2.    *The Coalition Will Suffer Irreparable Harm if Mr. Ragbir is*
           *Deported*

    Absent relief, the Coalition likewise faces irreparable injury. Mr. Ragbir is

the Coalition's Executive Director and its only full-time staff member. The

Coalition thus stands to lose the foundation and the face of the organization. His

loss will be irreplaceable.

    The district court simply ignored the harm to the Coalition. But this Court

has held that "[s]ervices that are not simply of value to [an organization], but that

may also truly be said to be special, unique or extraordinary may entitle an

[organization] to injunctive relief." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70

(2d Cir. 1999). Mr. Ragbir's contributions to the Coalition fit this description

perfectly. He is uniquely and personally invested in the Coalition's mission. He conceived, built, and sustains most of the Coalition's programs. He is the primary point of contact among the Coalition, funders, elected officials, faith leaders, and legal services organizations. Mr. Ragbir's deportation would deal a permanent, devastating blow to the Coalition's ability to continue its activities.

## B. The Balance of Hardships and the Public Interest Favor Preliminary Relief

The balance of hardships and the public interest "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Here, the balance of hardships overwhelmingly favors Plaintiffs. Plaintiffs face enormous irreparable injury if an injunction is not granted. Conversely, neither the public nor the government faces any substantial hardship from a preliminary injunction.

"Of course there is a public interest in preventing aliens from being wrongfully removed." *Id.* at 436. The district court stated that there is "little concern" about wrongful removal here because "the validity of Ragbir's removal has been tested repeatedly and upheld." A-0295 (Dkt 96 at 7). But none of Mr. Ragbir's prior proceedings have addressed the First Amendment claims Plaintiffs press here. And the public has an overwhelming interest in preventing Defendants from removing immigrants in retaliation for their protected speech and advocacy, in violation of the First Amendment—as Defendants have attempted to do here.

Any countervailing interest Defendants or the public have in the "prompt execution of removal orders," A-0294 (Dkt 96 at 6, quoting *Nken*, 556 U.S. at 436), carries little weight here. The mere fact that a noncitizen is removable does not mean that the public interest favors his removal. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 396 (2012) (listing reasons why removal may be "inappropriate even where [the noncitizen] has committed a removable offense or fails to meet the criteria for admission"). ICE itself has not sought to deport Mr. Ragbir notwithstanding a final order of removal for the past 11 years, undermining any argument that his deportation in particular is somehow urgently needed. *Cf. Nwaokolo v. INS*, 314 F.3d 303, 310 (7th Cir. 2002) (granting a stay of removal and noting that "the INS has known for years exactly where Ms. Nwaokolo resides and has not actively sought to expedite her removal").

ICE's decision to allow Mr. Ragbir to live and work in the United States for the last decade also underscores that the balance of hardships supports granting temporary relief. As ICE itself recognized in granting Mr. Ragbir an Order of Supervision and repeated administrative stays of removal, he is not a flight risk or a danger to the community. *Cf. Nken*, 556 U.S. at 436 (interest in removal may be heightened if the alien is "particularly dangerous"). Mr. Ragbir has complied with every condition of his release, including attending regular in-person check-ins with ICE. If anything, Mr. Ragbir is an asset to the community. He is a respected

community leader and has devoted himself to advocating tirelessly on behalf of vulnerable, underserved members of our society.

Other than ICE's recently instituted pattern and practice of retaliatory enforcement of the immigration laws, there has been no change in Mr. Ragbir's situation that would justify any overwhelming interest in his immediate deportation. And to the extent ICE's prior forbearance rested upon pending challenges to Mr. Ragbir's removal order and underlying conviction, *see* A-0295-296 (Dkt 96 at 6-7), he has never been closer to succeeding on those challenges than he is today. The District of New Jersey has held that Mr. Ragbir has shown a "likelihood of success" on his coram nobis petition, which will be fully briefed within weeks. 2018 WL 1446407 at *12; *supra* p. 6, n.2.

Finally, "securing First Amendment rights is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Conversely, "it is decidedly against the public interest to abide the continued enforcement of an unconstitutional policy or law." *Deferio v. City of Syracuse*, 193 F. Supp. 3d 119, 131 (N.D.N.Y. 2016). There is little public interest, if any, in Mr. Ragbir's immediate deportation, but there is an immense public interest in preventing Mr. Ragbir's wrongful removal and upholding the First Amendment.

## CONCLUSION

For the foregoing reasons, the district court's order denying in part Plaintiffs' motion for a preliminary injunction should be reversed, or at a minimum vacated, and the case should be remanded for further proceedings. Either reversal or vacatur would have the effect of reinstating the temporary stay of removal that the parties agreed to and the district court ordered at the outset of this case pending resolution of Plaintiffs' motion for a preliminary injunction. For the avoidance of doubt, this Court's opinion and judgment should make clear that Mr. Ragbir's removal is stayed pending resolution of the merits of Plaintiffs' preliminary injunction motion on remand.

Date: August 31, 2018

Respectfully submitted,

/s    R. Stanton Jones
_____

Alina Das
Jessica Rofé
WASHINGTON SQUARE
  LEGAL SERVICES, INC.
Immigrant Rights Clinic
New York University School of Law
245 Sullivan Street, 5th Floor
New York, New York 10012
(212) 998-6430
alina.das@nyu.edu

R. Stanton Jones
William C. Perdue
Sally L. Pei
Andrew T. Tutt
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999
stanton.jones@arnoldporter.com

Emily Newhouse Dillingham
ARNOLD & PORTER
  KAYE SCHOLER LLP

70 West Madison Street
Suite 4200
Chicago, IL 60602
(312) 583-2300
(312) 583-2360 (fax)
emily.dillingharn@arnoldporter.com

Ada Añon
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
(303) 836-8689 (fax)
ada.anon@arnoldporter.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2018, the foregoing was electronically

filed with the Court via the appellate CM/ECF system, and that copies were served

on all counsel of record by operation of the CM/ECF system on the same date.


Dated:  August 31, 2018                                  /s/ R. Stanton Jones
                                                         R. Stanton Jones

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with Fed. R. App. P.

32(a)(7)(B) and (C) because it contains 13,495 words.  The brief also complies

with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & 32(a)(6)

because it has been prepared in a proportionally spaced, roman style typeface of 14

points or more.


Dated:  August 31, 2018                                    /s/ R. Stanton Jones
                                                           R. Stanton Jones