# 18-1597

# United States Court of Appeals
# For the Second Circuit

RAVIDATH LAWRENCE RAGBIR, NEW SANCTUARY COALITION OF NEW
YORK CITY, CASA DE MARYLAND, INC., DETENTION WATCH
NETWORK, NATIONAL IMMIGRATION PROJECT OF THE NATIONAL
LAWYERS GUILD, NEW YORK IMMIGRATION COALITION,

*Plaintiffs-Appellants*,

v.

THOMAS D. HOMAN, in his official capacity as Deputy Director and
Senior Official Performing the Duties of the Director of U.S.
Immigration and Customs Enforcement, *et al.*
(addition Defendants listed on inside cover)

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of New York
Case No. 18-CV-1159 (Hon. P. Kevin Castel)

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

Alina Das
Jessica Rofé
WASHINGTON SQUARE
  LEGAL SERVICES, INC.
Immigrant Rights Clinic
New York University School of Law
245 Sullivan Street, 5th Floor
New York, New York 10012
(212) 998-6430
alina.das@nyu.edu

R. Stanton Jones
William C. Perdue
Sally L. Pei
Andrew T. Tutt
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999
stanton.jones@arnoldporter.com

*Counsel for Plaintiffs-Appellants (additional counsel listed on inside cover)*

THOMAS DECKER, in his official capacity as New York Field Office Director for U.S. Immigration and Customs Enforcement, SCOTT MECHKOWSKI, in his official capacity as Assistant New York Field Office Director for U.S. Immigration and Customs Enforcement, UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, KIRSTJEN M. NIELSON, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, JEFFERSON B. SESSIONS III, in his official capacity as Attorney General of the United States, UNITED STATES DEPARTMENT OF JUSTICE,

*Defendants-Appellees.*

Emily Newhouse Dillingham
ARNOLD & PORTER
  KAYE SCHOLER LLP
70 West Madison Street
Suite 4200
Chicago, IL 60602
(312) 583-2300
(312) 583-2360 (fax)
emily.dillingharn@arnoldporter.com

Ada Añon
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
(303) 836-8689 (fax)
ada.anon@arnoldporter.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ...............................................................................1

ARGUMENT .......................................................................................2

I.     The District Court Had Subject-Matter Jurisdiction ......................2

       A.     Section 1252 Does Not and Cannot Constitutionally Bar All Judicial Review of Colorable Constitutional Claims ...........................3

              1.     Section 1252 Is Unconstitutional as Applied if It Bars All Judicial Review of Colorable Constitutional Claims ..................4

              2.     Section 1252(g) Does Not Clearly Bar All Judicial Review of Colorable Constitutional Claims ..................................8

              3.     Section 1252(b)(9) Does Not Clearly Bar All Judicial Review of Colorable Constitutional Claims ...........................12

       B.     Plaintiffs' First Amendment Claims Are More than Colorable ..........14

              1.     Deporting Mr. Ragbir in Retaliation for His Public Criticism of ICE Is an "Outrageous" Violation of the First Amendment 15

              2.     Mr. Ragbir's Removal Order Does Not Defeat Plaintiffs' Retaliation Claims ...................................................................23

II.    The Remaining Factors Heavily Favor Preliminary Relief ...........26

       A.     Plaintiffs Face Irreparable Harm Absent Relief ..................................26

       B.     The Balance of Hardships and Public Interest Favor Preliminary Relief ...................................................................28

CONCLUSION ..................................................................................29

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agostini v. Felton*,
521 U.S. 203 (1997)..........................................................................13

*Arce v. United States*,
899 F.3d 796 (9th Cir. 2018) ...............................................11, 12, 14

*Battaglia v. General Motors Corp.*,
169 F.2d 254 (2d Cir. 1948) ...............................................................4

*Calcano-Martinez v. INS*,
232 F.3d 328 (2d Cir. 2000), *aff'd* 533 U.S. 348 (2001)..................8, 9

*City of Houston v. Hill*,
482 U.S. 452 (1987)..........................................................................15

*Connick v. Thompson*,
563 U.S. 51 (2011)............................................................................23

*Devitri v. Cronen*,
289 F. Supp. 3d 287 (D. Mass. 2018),
*appeal filed* (1st Cir. Feb. 1, 2018).....................................................9

*Duamutef v. INS*,
386 F.3d 172 (2d Cir. 2004) .........................................................8, 10

*Elgharib v. Napolitano*,
600 F.3d 597 (6th Cir. 2010) ............................................................10

*Elrod v. Burns*,
427 U.S. 347 (1976)..........................................................................26

*Hamama v. Adducci*,
261 F. Supp. 3d 820 (E.D. Mich. 2017) ..............................................9

*Hartman v. Moore*,
547 U.S. 250 (2006)..........................................................................15

iii

*INS v. St. Cyr*,
533 U.S. 289 (2001).....................................................................................12, 13

*Jean-Baptiste v. Reno*,
144 F.3d 212 (2d Cir. 1998) ...................................................................9

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018)...............................................................................13, 14

*Lozman v. City of Riviera Beach*,
138 S. Ct. 1945 (2018).............................................................................23

*Luna v. Holder*,
637 F.3d 85 (2d Cir. 2011) .....................................................................10

*Martin v. Hunter's Lessee*,
14 U.S. 304 (1816)...................................................................................4

*Matter of Acosta*,
19 I. & N. Dec. 211 (BIA 1985) .............................................................21

*Ogunwomoju v. United States*,
512 F.3d 69 (2d Cir. 2008) .....................................................................7

*Perry v. Sindermann*,
408 U.S. 593 (1972).................................................................................25

*Preiser v. Rodriguez*,
411 U.S. 475 (1973).................................................................................6

*Ragbir v. United States*,
2018 WL 1446407 (D.N.J. Mar. 23, 2018) ......................................14, 25, 26, 28

*Rajah v. Mukasey*,
427 F.3d 427 (2d Cir. 2008) ...................................................................16

*Reno v. American-Arab Anti-Discrimination Committee*,
525 U.S. 471 (1999)...................................................................9, 11, 16, 18, 20

*Ruiz-Martinez v. Mukasey*,
516 F.3d 102 (2d Cir. 2008) ...................................................................9

*Russello v. United States*,
464 U.S. 16 (1983) ...................................................................11

*Sebelius v. Auburn Reg'l Med. Ctr.*,
568 U.S. 145 (2013) .................................................................10

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996) ....................................................................6

*Silva v. United States*,
866 F.3d 938 (8th Cir. 2017) ..................................................10

*Simmonds v. INS*,
326 F.3d 351 (2d Cir. 2003) ...................................................6, 7

*United States v. Dreyer*,
804 F.3d 1266 (9th Cir. 2015) ..................................................5

*Webster v. Doe*,
486 U.S. 592 (1988) ...............................................................8, 14

CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const., am. I ...........................................................................4

U.S. Const., art. III, § 2 ..................................................................4

8 U.S.C.
§ 1252(a)(2)(D) ........................................................................11
§ 1252(b) .............................................................................12, 13
§ 1252(b)(9) .........................................2, 3, 12, 13, 14, 20
§ 1252(g) ............................ 2, 3, 4, 5, 8, 9, 10, 11, 20

28 U.S.C.
§ 1331 ...........................................................................................2
§ 2241 ........................................................................................2, 7

# INTRODUCTION

In an outrageous move, ICE is attempting to deport one of the nation's leading immigrant-rights activists in retaliation for his outspoken criticism of U.S. immigration law and policy. ICE is seeking to silence this activist pursuant to a widespread pattern and practice of retaliating against core protected political advocacy for immigrants' rights and against inhumane immigration enforcement. It is hard to imagine a more blatant and outrageous violation of the First Amendment. Yet the government contends that deporting Mr. Ragbir in an effort to insulate ICE from democratic accountability is perfectly constitutional, and that no court has jurisdiction even to hear Plaintiffs' constitutional claims.

The government's position is an open invitation to unchecked abuse. Remarkably, the government does not dispute that under its view, immigration officials could constitutionally deport any noncitizen solely and exclusively for disparaging ICE, for attending a rally, or even for refusing to publicly endorse a piece of pending legislation or a candidate for public office—all without any judicial review whatsoever. The government derides these hypotheticals as "outlandish," but the fact that the government's position embraces such deeply troubling scenarios just shows how radical the government's arguments really are. Moreover, these scenarios are not far from the facts of this case—the government does not deny that ICE already deported one Coalition leader and is aggressively

attempting to deport another after expressly warning them, "You don't want to make matters worse by saying things."

Make no mistake:  Affirming the decision below would give ICE officials carte blanche to use the threat of deportation to censor, punish, or even compel any noncitizen speech they choose, for any reason, without any judicial review. Because that result contravenes the First Amendment and is outrageous by any measure, the Court should reverse and remand.

## ARGUMENT

### I.    The District Court Had Subject-Matter Jurisdiction

Ultimately, the jurisdictional analysis in this case collapses into the merits. On their face, both the federal question statute, 28 U.S.C. § 1331, and the habeas statute, 28 U.S.C. § 2241, gave the district court subject-matter jurisdiction over Plaintiffs' First Amendment claims.  The government argues at length that 8 U.S.C. § 1252(g) and § 1252(b)(9) stripped the district court of jurisdiction, and also that the Suspension Clause does not apply here.  But those arguments are beside the point, because the government does not dispute that any statute purporting to strip federal courts of jurisdiction over colorable First Amendment claims would violate both the First Amendment itself and Article III.  In addition, while the government argues that Plaintiffs' claims are not colorable, it conspicuously does *not* argue that § 1252 validly bars all judicial review even if

Plaintiffs' claims *are* colorable.  The government thus apparently agrees that if Plaintiffs have colorable First Amendment claims here, the district court did—and indeed must—have jurisdiction over them.

The ultimate question before this Court, therefore, is whether Plaintiffs have a colorable claim that deporting one of the nation's leading immigrant-rights activists in retaliation for his core protected political speech, pursuant to a widespread pattern and practice designed to insulate ICE and its actions from public criticism, violates the First Amendment.  The answer to that question is yes, and the government's contrary arguments do not withstand scrutiny.

## A.  Section 1252 Does Not and Cannot Constitutionally Bar All Judicial Review of Colorable Constitutional Claims

The government argues that both § 1252(g) and § 1252(b)(9) bar any federal court from ever hearing Plaintiffs' claims.  The Court need not concern itself with those arguments in light of the government's apparent agreement that barring all federal court review of a colorable First Amendment claim would be unconstitutional as applied.  Regardless, the First Amendment, Article III, and the Suspension Clause all plainly mandate jurisdiction here.  And properly read, nothing in § 1252(g) or § 1252(b)(9) evinces a sufficiently clear congressional intent to bar all review of any colorable constitutional claim.

*1.     Section 1252 Is Unconstitutional as Applied if It Bars All
        Judicial Review of Colorable Constitutional Claims*

1.  As explained in Plaintiffs' opening brief, to the extent § 1252(g),

§ 1252(b)(9), or any other statutory provision purports to strip federal courts of

jurisdiction over colorable First Amendment claims that cannot be heard in any

other forum, that provision is unconstitutional as applied.  Pls.' Br. 28-29.  In

*Battaglia v. General Motors Corp.*, 169 F.2d 254, 257-59 (2d Cir. 1948), this

Court held that the Due Process Clause would bar Congress from stripping federal

courts of jurisdiction to hear a colorable due process challenge to a federal statute.

So too here, stripping federal courts of jurisdiction to hear Plaintiffs' First

Amendment claims—provided those claims are colorable—violates the First

Amendment.  "[W]hile Congress has the undoubted power to give, withhold, and

restrict the jurisdiction of courts other than the Supreme Court, it must not exercise

that power," *id.* at 257, so as to "abridge[e] the freedom of speech," U.S. Const.,

am. I.

Plaintiffs also explained that stripping jurisdiction over a colorable First

Amendment claim would violate Article III, § 2.  Pls.' Br. 29.  That clause

provides: "[T]he judicial power shall extend to all cases, in law and equity, arising

under th[e] Constitution."  U.S. Const., art. III, § 2.  That command means what it

says—federal jurisdiction over colorable constitutional claims "extend[s] to all

cases whatsoever."  *Martin v. Hunter's Lessee*, 14 U.S. 304, 335 (1816).  Any

other result would rob the Constitution of its proper status as the supreme law of the land.

The government offers no response whatsoever to these arguments. "Generally, an appellee waives any argument it fails to raise in its answering brief." *United States v. Dreyer*, 804 F.3d 1266, 1277 (9th Cir. 2015). This Court thus may safely ignore all of the government's arguments about § 1252(g), § 1252(b)(9), and the Suspension Clause, and proceed straight to the merits. So long as Plaintiffs have a colorable First Amendment claim on the merits, the Constitution mandates jurisdiction in the district court.

2. Beyond the government's apparent concession regarding the First Amendment and Article III, the Suspension Clause independently mandates jurisdiction here. Pls.' Br. 24-27. Mr. Ragbir is seeking release from an imminent, severe restriction on his liberty—banishment from this country—and the government does not dispute that this lawsuit is the *only* mechanism by which he can obtain judicial review. *See id.* at 25-26. The government nevertheless asserts that habeas jurisdiction is unavailable because "rather than seeking anything that could be described as 'release' or any change to Ragbir's status, plaintiffs ask the Court to maintain Ragbir in precisely the same position he is in now." Gov. Br. 44-45. To the extent the government argues that the Great Writ is reserved solely to order release from physical confinement or change in status, that contention is

refuted by *INS v. St. Cyr*, 533 U.S. 289 (2001) which involved a challenge not to detention but to a removal order. *Id.* at 300, 305; *see also Rumsfeld v. Padilla*, 542 U.S. 426, 437 (2004) (noting that "custody … include[s] restraints short of physical confinement"). Moreover, the Supreme Court has held that habeas jurisdiction is available "to attack future confinement"—which the government does not dispute Mr. Ragbir faces—"and obtain future releases." *Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973); *see* Pls.' Br. 24-25. This Court, along with several other circuits, has applied these principles to habeas claims by noncitizens seeking to prevent their deportation. *See Simmonds v. INS*, 326 F.3d 351, 354 (2d Cir. 2003).

The government attempts to distinguish *Simmonds* on the ground that "[a] final order of removal renders an alien 'in custody' only for the purposes of challenging that final order of removal." Gov. Br. 46. Not so. While *Simmonds* involved a challenge to a noncitizen's removal order itself, there is no basis to limit its holding to that particular circumstance. "When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which [later courts] are bound." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996). This Court's express holding in *Simmonds* was categorical: "[S]ubjecting an alien to a final order of removal is to place that alien in custody within the meaning of the habeas statute." 326 F.3d at 354. And the Court's

reasoning was straightforward: A habeas petitioner subject to a future deprivation of liberty is "in custody" so long as there is "a reasonable basis to conclude" that the future liberty deprivation will in fact take place. *Id.* at 356. For a noncitizen subject to a final removal order, the removal order itself provides the requisite "reasonable basis to conclude" that the liberty deprivation inherent in any deportation will take place. *Id.* Contrary to the government's suggestion, Gov. Br. 46, nothing about the REAL ID Act changes that analysis. Regardless, this Court has reaffirmed *Simmonds* after the REAL ID Act. *See Ogunwomoju v. United States*, 512 F.3d 69, 74 n.8 (2d Cir. 2008).

Here, the government cannot seriously dispute that ICE will detain and deport Mr. Ragbir as soon as it is permitted to do so. Even beyond Mr. Ragbir's final removal order itself, at oral argument on Plaintiffs' stay motion, government counsel could not represent that ICE would wait even "one day" after any stay dissolves before immediately banishing Mr. Ragbir from this country. Oral Argument Regarding Plaintiffs' Motion for Stay at 29:00-29:30 (Aug. 14, 2018).

This Court's decision in *Ogunwomoju*, Gov. Br. 46-47, is not to the contrary. While that case reaffirmed *Simmonds* after the REAL ID Act, it involved a habeas claim not under § 2241, but under § 2254. And § 2254 requires a habeas petitioner to be not only "in custody," but also "in custody pursuant to the judgment of a State court." The Court held that a noncitizen in immigration

detention based on a prior state-court conviction failed § 2254's "pursuant to the judgment of a State court" requirement, *not* the "in custody" requirement. *See* 512 F.3d at 73-75; Pls.' Br. 27 n.6.

*Duamutef v. INS*, 386 F.3d 172 (2d Cir. 2004), Gov. Br. 46, is similarly inapposite. The Court there expressly declined to decide "the specific custody question presented." 386 F.3d at 178. And the Court's concerns about whether Mr. Duamutef was in custody centered around the fact that he was not seeking *release* from the liberty deprivation inherent in his future deportation, but rather to *accelerate* it. As Plaintiffs' explained, those concerns obviously are not present here. Pls.' Br. 27. The government offers no response.

      2.    *Section 1252(g) Does Not Clearly Bar All Judicial Review of Colorable Constitutional Claims*

Again, in light of the government's apparent concession that if read to bar all judicial review of a colorable constitutional claim, § 1252(g) would be unconstitutional as applied, the Court need not concern itself with the government's arguments about the proper scope of that provision. But if the Court prefers to avoid addressing the constitutionality of § 1252(g), it may do so, because § 1252(g) does not apply to Plaintiffs' claims in the first place.

1. The parties agree that "where Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988); *see* Pls.' Br. 30; Gov. Br. 23. This Court has twice

invoked that principle to read § 1252 in ways it would not have otherwise so as to avoid precluding all judicial review of colorable claims. *See* Pls.' Br. 26-27, 33. In *Calcano-Martinez v. INS*, 232 F.3d 328, 340-42 (2d Cir. 2000), *aff'd* 533 U.S. 348 (2001), this Court held that § 1252(g) did not bar habeas claims by certain noncitizens who were prohibited from filing petitions for review. And in *Ruiz-Martinez v. Mukasey*, 516 F.3d 102, 113-17 (2d Cir. 2008), the Court construed § 1252 to allow otherwise untimely petitions for review by noncitizens who were barred from filing habeas petitions. The government notes that *Ruiz-Martinez* "upheld" the statute "against [a] Suspension Clause challenge[]," Gov. Br. 26, but that is precisely the point—in both *Ruiz-Martinez* and *Calcano-Martinez*, the Court construed § 1252 to allow noncitizens with colorable claims to obtain judicial review *in order to avoid a Suspension Clause violation*.

Notably, the government does not cite a *single* case reaching the opposite result—construing § 1252(g) (or any other statute) to validly bar all judicial review of a colorable constitutional claim. In *Reno v. American-Arab Anti-Discrimination Committee* ("*AADC*"), 525 U.S. 471, 491 (1999), *see* Gov. Br. 21-22, the Supreme Court held that the plaintiffs had no colorable claim that immigration officials violated the Constitution by targeting them based on their material support for an alleged foreign terrorist organization. The government itself acknowledges that in *Jean-Baptiste v. Reno*, 144 F.3d 212 (2d Cir. 1998), "the aliens' constitutional

claims w[ere] *reviewable* in a habeas proceeding." Gov. Br. 22 n.4 (emphasis

added). And the district courts in *Devitri v. Cronen*, 289 F. Supp. 3d 287, 294 (D.

Mass. 2018), *appeal filed* (1st Cir. Feb. 1, 2018), and *Hamama v. Adducci*, 261 F.

Supp. 3d 820, 829 (E.D. Mich. 2017), *see* Gov. Br. 26-27, held that § 1252(g)

violated the Suspension Clause as applied and exercised habeas jurisdiction on that

basis. Those cases hardly support the notion that Plaintiffs' colorable

constitutional claims "are not reviewable" at all. Gov. Br. 24. The government's

other cases all are inapposite for similar reasons.[1]

    2. The government's textual and structural arguments are equally

unpersuasive. The government acknowledges that § 1252(g) does not mention

"constitutional" claims, while other subsections of § 1252 enacted or amended at

the same time do. Gov. Br. 23-24. The point is not that Congress must "incant

magic words in order to speak clearly," *id.* at 23 (quoting *Sebelius v. Auburn Reg'l

Med. Ctr.*, 568 U.S. 145, 153 (2013)), but that "the disparate inclusion or

---

[1] *See Silva v. United States*, 866 F.3d 938, 939 (8th Cir. 2017) (cited at Gov. Br.
23) (noncitizen already obtained judicial review via a prior proceeding, and court
acknowledged "an exception to § 1252(g) for a habeas claim raising a pure
question of law," given that "a contrary rule would give rise to substantial
constitutional questions"); *Elgharib v. Napolitano*, 600 F.3d 597, 600 n.2 (6th Cir.
2010) (cited at Gov. Br. 23) (noncitizen "could have obtained review of her Due
Process Clause claims through judicial review of her final order of removal in the
court of appeals"); *Luna v. Holder*, 637 F.3d 85, 87 (2d Cir. 2011) (cited at Gov.
Br. 24) ("the statutory motion to reopen process" was "an adequate and effective
substitute for habeas review"); *Duamutef*, 386 F.3d at 179-80 (cited at Gov. Br. 25)
(noncitizen's constitutional claims failed on the merits).

exclusion" of the same word in nearby provisions of the same statute, which Congress enacted and amended in tandem, is interpretively significant. *Russello v. United States*, 464 U.S. 16, 23 (1983) (brackets and quotation marks omitted).

The relationship between § 1252(g) and § 1252(a)(2)(D)—which expressly preserves noncitizens' right to raise "constitutional" claims in a petition for review—underscores the absence of any clear congressional intent to preclude all judicial review of colorable constitutional claims. *See* Pls.' Br. 32. The government asserts that this structure shows Congress's intent to "to channel constitutional claims into the petition for review process—and … to bar them in other actions." Gov. Br. 24. The first half of that assertion is sound, but the second is not. The only clear lesson from § 1252's structure is a careful intent to *preserve* judicial review of constitutional claims that can be raised via a petition for review. Nothing in the statute clearly indicates that Congress intended to provide a completely different result for claims, like Plaintiffs' claims here, that could not have been raised through a petition for review.

Furthermore, the government does not dispute the Supreme Court's directive to interpret § 1252(g) "narrow[ly]." *AADC*, 525 U.S. at 486; Pls.' Br. 31. The Ninth Circuit has followed that directive and, even if the absence of any constitutional question, has "limit[ed] § 1252(g)'s scope to discretionary decisions that the Attorney General actually has the power to make, as compared to the

violation of his mandatory duties." *Arce v. United States*, 899 F.3d 796, 801 (9th Cir. 2018). The government attempts to distinguish *Arce* on the ground that there, the claims "arose 'not from the execution of [a] removal order, but from the violation of' [a] judicial stay order," whereas here, "no such court order or similar legal impediment exists." Gov. Br. 26 (quoting *Arce*, 899 F.3d at 800). That is simply wrong—the First Amendment itself prohibits Defendants from retaliating on the basis of protected speech here. In both *Arce* and this case, the claims arose not from any allegedly improper balancing of discretionary factors, but from the blatant violation of an enforceable legal command.

### 3. Section 1252(b)(9) Does Not Clearly Bar All Judicial Review of Colorable Constitutional Claims

It is doubly unnecessary for the Court to reach the government's arguments about § 1252(b)(9)—first, the district court never addressed that provision, and second, the government again appears to agree that if Plaintiffs' claims are colorable, barring all judicial review would be unconstitutional. But if the Court addresses § 1252(b)(9), it should reject the government's arguments.

The government does not dispute that in *St. Cyr*, the Supreme Court held that *all* of § 1252(b), including § 1252(b)(9), "applies *only* '[w]ith respect to review of an order of removal under subsection (a)(1).'" 533 U.S. at 313 (quoting 8 U.S.C. § 1252(b)) (emphasis added); *see* Pls.' Br. 34-35 n.7. That interpretive holding is binding on this Court. The government asserts that *St. Cyr* is inapposite

- 12 -

because it pre-dates the REAL ID Act, but the REAL ID Act did not amend the prefatory clause of § 1252(b) that the Supreme Court construed in *St. Cyr*. And the government does not explain why the changes the REAL ID Act made to other parts of the statute—including "restor[ing] criminal aliens' access to the petition for review process," Gov. Br. 30—should change what § 1252(b) does and does not apply to.

The government also asserts that language from the plurality opinion and Justice Thomas's concurrence in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), "suggests that the Supreme Court would apply § 1252(b)(9) to plaintiffs' claims." Gov. Br. 29. But nothing in *Jennings* remotely purports to overrule *St. Cyr*, and the government's attempt to cobble together five votes for such a sea-change is irrelevant. The Supreme Court has admonished that "[i]f a precedent of th[e Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to th[e Supreme] Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). This Court should decline the government's invitation to defy controlling Supreme Court precedent.

Moreover, the *Jennings* plurality rejected arguments similar to those the government makes here. Notwithstanding § 1252(b)(9), the Court in *Jennings*

exercised jurisdiction over claims challenging prolonged immigration detention without bail.  Section 1252(b)(9) is limited to claims "arising from an[] action taken or proceeding brought to remove an alien from the United States."  But when "when confronted with capacious phrases like 'arising from,'" the plurality explained, the Supreme Court has "eschewed uncritical literalism leading to results that no sensible person could have intended."  *Jennings*, 138 S. Ct. at 840.  Many legal questions would never arise but for removal proceedings, "but cramming judicial review of those questions into the review of final removal orders would be absurd."  *Id.*  Doing so would be particularly absurd here, as Plaintiffs' claims did not arise until a *decade* after the proceedings reviewing Mr. Ragbir's final removal order ended.  Here, Plaintiffs' claims arise not from the removal process itself, but from Defendants' unlawful decision to retaliate against protected speech.  *See supra* pp. 11-12; *Arce*, 899 F.3d at 800; *Ragbir v. United States*, 2018 WL 1446407, at *8-9 (D.N.J. Mar. 23, 2018).  In these circumstances, § 1252(b)(9) "does not present a jurisdictional bar."  *Jennings*, 138 S. Ct. at 841 (plurality op.).

## B.    Plaintiffs' First Amendment Claims Are More than Colorable

Again, the government appears to agree that barring all review of a "colorable" constitutional claim would be unconstitutional as applied.  Pls.' Br. 35 (quoting *Webster*, 486 U.S. at 603).  And the government does not dispute that the district court—after refusing to allow any discovery or hold an evidentiary

hearing—"accepted as true" Plaintiffs' factual contentions that Defendants "are executing the order of removal to silence [Mr. Ragbir] and stifle his advocacy of immigrant rights." A-0277. The central question in this case thus is whether there is a colorable claim that deporting a prominent immigrant-rights activist in retaliation for his outspoken criticism of U.S. immigration law and policy, pursuant to a widespread pattern and practice designed to insulate ICE from public criticism, violates the First Amendment. That claim is more than colorable, and adopting the government's contrary arguments would invite unchecked abuse.

1. *Deporting Mr. Ragbir in Retaliation for His Public Criticism of ICE Is an "Outrageous" Violation of the First Amendment*

1. The government does not dispute that "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *see* Pls.' Br. 35-36. Nor could it. The constitutional prohibition against retaliation on the basis of protected speech is essential to ordered liberty and a critical bulwark against government oppression. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 452, 462-63 (1987). Any notion that the government may lawfully retaliate against individuals who speak out against government action they oppose threatens our most fundamental freedoms.

2.  The government invokes *AADC*'s holding that "[a]s a general matter" noncitizens have "no constitutional right to assert selective enforcement as a defense against his deportation."  Gov. Br. 31 (quoting *AADC*, 525 U.S. at 488).  But *AADC* carefully preserved "the possibility of a rare case in which the alleged basis of discrimination is so outrageous" as to allow such a claim.  525 U.S. at 491.  And this Court in *Rajah v. Mukasey*, 427 F.3d 427 (2d Cir. 2008), made clear that this exception for "outrageous" retaliation is real.  *Id.* at 438.  The government does not contend otherwise.  *See* Gov. Br. 32.

It is "outrageous" for ICE to deport a leading immigrant-rights activist in retaliation for his outspoken criticism of U.S. immigration law and policy.  ICE is weaponizing the very immigration laws that Mr. Ragbir has criticized in order to silence his criticism.  By banishing Mr. Ragbir from this country, ICE officials are trying to insulate themselves and the laws they enforce from public criticism and, ultimately, democratic accountability.  This is blatant viewpoint discrimination against core political speech on a matter of the utmost public concern.  Pls.' Br. 36-38.  There is no other context in which anyone would even question whether such retaliation and viewpoint discrimination violates the First Amendment.  What ICE officials are doing is wrong, and it strikes at the very heart of the freedom of speech.  If this retaliation by ICE is not outrageous, nothing is.

Immigration officials retaliating against public criticism of U.S. immigration law and policy is so obviously "outrageous" that the government never brings itself to directly address the question. Instead, the government attempts to change the subject, arguing that it had a "rational basis" to deport Mr. Ragbir in light of his criminal conviction and prior legal proceedings. Gov. Br. 36 (quotation marks omitted). But neither Mr. Ragbir's conviction, *see id.* at 33, nor his past challenges to that conviction and subsequent removal proceedings, *see id.* at 34, has any bearing on the outrageousness of ICE's conduct here. Nor do ICE's policies prioritizing the removal of noncitizens with criminal convictions or final removal orders. *See id.* at 35. Those arguments ignore Plaintiffs' allegations and evidence in this case. To be clear: ICE is not attempting to deport Mr. Ragbir because of his conviction or final removal order. It is not executing the removal order in the ordinary course or routinely applying enforcement priorities. The whole point of Plaintiffs' claims is that that is not what is happening. Rather, ICE is attempting to deport Mr. Ragbir in retaliation for his protected speech. It is weaponizing his removal order to punish and silence him. Those are the factual contentions that the district court "accepted as true." A-0277. Retaliating against protected core political speech serves no conceivable legitimate government interest, and nothing the government says dampens the outrage at such invidious retaliation.

Contrary to the government's assertions, the "wider facts alleged in this case" heighten the outrageousness of ICE's conduct. Gov. Br. 35. Plaintiffs allege that ICE's retaliation against Mr. Ragbir is part of a widespread pattern and practice of retaliating against immigrant-rights activists on the basis of their criticism of U.S. immigration law and policy. *See* Pls.' Br. 13-15, 45. These allegations, which include dozens of retaliatory actions by ICE across the country in a clear and identifiable pattern, are far from "sparse." Gov. Br. 41. Plaintiffs' Amended Complaint, filed in the district court on July 19, 2018, describes even more examples of retaliation by ICE that have arisen since Plaintiffs filed this action, and even during the pendency of this appeal. A-0035 (ECF No. 100).

The conduct in this case is far more outrageous than what occurred in *AADC*. *Cf.* Gov. Br. 36. There, plaintiffs claimed that immigration officials violated the Constitution by targeting them based on their material support for "a group that the Government characterize[d] as an international terrorist and communist organization." *AADC*, 525 U.S. at 473. The Supreme Court held that "the Government does not offend the Constitution by deporting [a noncitizen] for the additional reason that it believes him to be a member of an organization that supports terrorist activity." *Id.* at 491-92. Indeed, the Supreme Court later held that the government may *criminally prosecute* someone for providing material support to a foreign terrorist organization without violating the First Amendment.

*Holder v. Humanitarian Law Project*, 561 U.S. 1, 39 (2010). So it is no surprise that, in that context of support for alleged foreign terrorist activity, the *AADC* Court found that the "general rule certainly applies," and the "alleged basis of discrimination" was not "so outrageous" to warrant an exception. 515 U.S. at 491.

This case could hardly be more different. Mr. Ragbir's purely domestic conduct has no connection to terrorism or national security. Defendants are punishing him for speaking out in the United States against U.S. laws and policies that he believes are unjust and inhumane. His outspoken advocacy is at the core of the First Amendment's free-speech guarantee, and his expression is in line with our greatest civic traditions. Comparing Mr. Ragbir to individuals the government targeted as supporters of an alleged foreign terrorist organization is as offensive as it is ineffectual.

The implications of the government's position in this case further underscore the outrageousness of ICE's conduct. Under the government's view, not only do courts lack jurisdiction, but the First Amendment itself imposes no limit on ICE's ability to selectively enforce the immigration laws in retaliation for core protected political speech. If this Court were to adopt that view, nothing would prevent ICE from telling noncitizens that it will deport them if they criticize any ICE official, deportation policy, or immigration law in any way. ICE could even command noncitizens with final removal orders to publicly voice support for ICE, or for

pending legislation, or for a particular political candidate. There would be no holds barred. To the extent the government believes these hypotheticals are "outlandish," Gov. Br. 37, that is a problem for the government's position, not Plaintiffs'. The government does not and cannot dispute that these scenarios describe conduct that would be perfectly lawful in the government's view.

The government's suggestion that "compelled-silence or compelled-speech clauses in orders of supervision" might be subject to judicial review notwithstanding § 1252, Gov. Br. 36, is utterly beside the point. To begin with, ICE could easily censor or compel speech along the same lines without writing it into any order of supervision. But even if ICE did write its retaliatory conduct into an order of supervision, the government's position here is not just that § 1252(g) strips jurisdiction, but that such retaliation against protected core political speech does not violate the First Amendment at all. That is why, in the government's view, § 1252(g) and § 1252(b)(9) are constitutional as applied—the government contends that the First Amendment actually *allows* ICE to deport Mr. Ragbir in retaliation for his protected speech. So the possibility that a plaintiff might get into court to challenge a clause in an order of supervision does not answer Plaintiffs' hypothetical, because in the government's view, that plaintiff's First Amendment claim would fail on the merits. There is simply no escaping that adopting the government's position in this case would give ICE free rein to weaponize final

removal orders against public criticism and other protected speech, with no judicial or legal limit whatsoever. That cannot be the law.

3. The government argues that the *AADC* exception for "outrageous" discrimination should be limited to "immutable" characteristics like "religion, ethnicity, gender, or race." Gov. Br. 37. But as Plaintiffs explained, to the extent religion is immutable, so too is political opinion—each is "a characteristic that either is beyond the power of an individual to change or is so fundamental to individual identity or conscience that it ought not be required to be changed." Pls.' Br. 42 (quoting *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985)). The government offers no response. What is more, Mr. Ragbir's political opinions and advocacy for immigrants' rights are deeply connected to his religious beliefs. He is the leader of the New *Sanctuary* Coalition, a group that prominently includes faith leaders and that works out of a church. The facts of this very case thus eviscerate the government's purported bright line between religious beliefs and political opinion. Consider the following statement, which accurately reflects Mr. Ragbir's activism: "My religious convictions compel me to speak out against America's inhuman immigration laws." Is that statement religious or political?

Even if "immutable" characteristics were a coherent category that excluded this case, there is no sound reason to limit *AADC*'s exception to such characteristics. The government's stated concern that noncitizens will try to

manufacture First Amendment defenses to removal by criticizing ICE is both speculative and fanciful. As Plaintiffs explained, no rational person living in the United States under a final order of removal would think that they could *increase* their chances of remaining in this country long-term by publicly criticizing ICE. Even if someone did try this high-risk, low-reward strategy, their protected speech would simply place them on par with any member of a religious, ethnic, or racial minority. Under *Rajah*, such a person can already claim that ICE is discriminating against them on the basis of a protected characteristic. The problem, of course, is that those claims will fail unless there is good reason to believe that ICE took action *because of* that characteristic. Pls.' Br. 42-43.

The government's focus on ICE's deportation of Amer Othman Adi, Gov. Br. 38, only undercuts the government's argument. There is powerful reason to believe that ICE deported Mr. Adi on the basis of his protected expressive conduct. A 57-year-old husband and father who owned a deli and had lived in the United States for four decades, Mr. Adi was arrested by ICE and began a hunger strike. Nine days later, in an extraordinary move flouting Congress's authority, ICE deported Mr. Adi even after a House Subcommittee had approved a private bill to stay his deportation for six months. A-0066. There is no telling whether Mr. Adi could have ultimately prevailed on a retaliatory removal claim, but the government cites no basis for suggesting that Mr. Adi's speech was anything other than

genuine. And no noncitizen could manufacture the media coverage his case garnered or ICE's open defiance of a congressional committee. Mr. Adi's case just shows that as in other areas of the law, the proper way to deal with the theoretical possibility of manufactured claims is to analyze them carefully, not bar them entirely.

### 2. *Mr. Ragbir's Removal Order Does Not Defeat Plaintiffs' Retaliation Claims*

Relying on cases holding that "the existence of probable cause defeats a First Amendment retaliatory arrest or prosecution claim," the government argues that the existence of a "valid final order of removal" likewise forecloses a First Amendment retaliatory removal claim. Gov. Br. 39. But as the government itself acknowledges, the Supreme Court recently held in *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018), that a plaintiff "may assert a retaliatory arrest claim … *even when probable cause existed for the arrest*," at least when "the plaintiff alleges that the arrest was the result of 'the existence and enforcement of an official policy motivated by retaliation.'" Gov. Br. 40 (quoting *Lozman*, 138 S. Ct. at 1954) (emphasis added). *Lozman* forecloses the government's argument.

Neither of the government's attempts to distinguish *Lozman* withstands scrutiny. First, as in *Lozman*, ICE is retaliating against Mr. Ragbir pursuant to an "official policy" of retaliation against immigrant-rights activists. As the government acknowledges, an "official policy" in this context includes both "the

acts of [government] policymakers" and "practices so persistent and widespread as to practically have the force of law." Gov. Br. 41 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). Here, Plaintiffs allege that Defendants sought to deport Mr. Ragbir pursuant to a premeditated plan formulated well in advance. *See* Pls.' Br. 2-3, 10-13. Plaintiffs also allege that ICE has engaged in a nationwide pattern and practice of retaliating against immigrant-rights activists on the basis of their criticism of U.S. immigration law and policy. *See* Gov. Br. 41; Pls.' Br. 13-15, 45. As described above, these allegations are not "sparse," Gov. Br. 41, but instead extensive and deeply troubling.

Second, the government's assertion that retaliation was not the "but-for cause of Ragbir's attempted removal," *id.* at 42-43, is nonsensical. The gravamen of this lawsuit is that ICE would not be attempting to deport Mr. Ragbir "but for" his outspoken criticism of ICE, its officials, and the laws and policies they enforce. And again, the district court "accepted as true" Plaintiffs' factual contention that "defendants are executing the order of removal to silence him and stifle his advocacy of immigrant rights." A-0277. For good reason: Plaintiffs provided detailed allegations and evidence supporting their claim that retaliation is the but-for cause of ICE's attempt to deport Mr. Ragbir; the government submitted unsworn affidavits that are evidence of nothing and in any event were riddled with critical errors that the government had to correct; and the district court refused to

allow discovery and did not hold an evidentiary hearing. Pls.' Br. 47. In these circumstances, there is no plausible basis to conclude that Plaintiffs will be unable to establish that retaliation was the but-for causation of the attempted removal.

Similarly unavailing is the government's contention that Mr. Ragbir's final removal order "is in itself a sufficient cause for ICE to attempt to remove Mr. Ragbir." Gov. Br. 43. That assertion simply ignores Plaintiffs' allegations and evidence that neither the removal order nor Mr. Ragbir's underlying conviction were *actually* the cause of the attempted removal. The true cause, rather, was Mr. Ragbir's core protected political speech—his outspoken criticism of ICE and the ICE officials now seeking to deport him. It makes no difference that ICE *could have* lawfully enforced the removal order absent this retaliatory motive. Even if the government may take an adverse action against a person for "any number of reasons," the First Amendment prohibits the government from taking the same action "because of his constitutionally protected speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

The government argues that ICE's "past discretionary decisions" allowing Mr. Ragbir to stay in the country are irrelevant because ICE was merely allowing him to pursue "challenges to his immigration proceedings." Gov. Br. 43. But the fact that ICE allowed Mr. Ragbir to live and work in the United States for a decade under orders of supervision and administrative stays, then abruptly reversed course

and attempted to deport him in an "unnecessarily cruel" and unlawful manner,

*Ragbir*, 2018 WL 623557, at *1, is highly probative of ICE's retaliatory intent.

Moreover, Mr. Ragbir continues to challenge the conviction that underpins his

removal order. Indeed, another district court has found that Mr. Ragbir is

sufficiently likely to prevail in his *coram nobis* challenge to warrant a stay of

removal. If Defendants' deportation decision really turned on Mr. Ragbir's

chances of prevailing in his other legal challenges, one would have expected them

to acquiesce in that stay. Pls.' Br. 56. But instead, ICE has appealed that stay

order, seeking the ability to deport Mr. Ragbir even before his *coram nobis* petition

is decided. ICE's dogged attempt to deport Mr. Ragbir despite his ongoing *coram

nobis* proceeding further highlights that ICE's true motive is retaliation.

## II.    The Remaining Factors Heavily Favor Preliminary Relief

### A.    Plaintiffs Face Irreparable Harm Absent Relief

1. "Irreparable injury is easily found" here. *Ragbir*, 2018 WL 1446407, at

*18. Even a "minimal" loss of First Amendment rights "unquestionably

constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); Pls.' Br.

48. The government responds by portraying the harm to Mr. Ragbir as a mere

"incidental burden" on his speech. Gov. Br. at 48-49. That is question-begging;

Mr. Ragbir alleges that Defendants targeted him *because of* his speech. Moreover,

the government nowhere disputes the obvious point that deportation would render

Mr. Ragbir's speech less meaningful and effective.  Pls.' Br. 49-50.  And recognizing that fact would not entitle "every alien challenging a removal order" to a finding of irreparable harm.  Gov. Br. 49.  Only those with viable First Amendment claims could establish such harm.

The government also asserts that the only harm Mr. Ragbir would suffer is "removal somewhat earlier than it otherwise would happen."  Gov. Br. 49.  That puts the cart before the horse.  The government ignores Mr. Ragbir's pending applications for relief—any one of which, if granted, could allow Mr. Ragbir to regain his status as a lawful permanent resident.  Pls.' Br. 51.  Moreover, the Government ignores the irreversible trauma that deportation would inflict on Mr. Ragbir, including indefinite separation from his family and an abrupt end to his work as an activist in the United States.  And the government never disavows its counsel's unwillingness to represent to this Court that, if Mr. Ragbir prevails, he will be allowed to return to the United States.  *See id.* at 51-52.

2.  Independent of the harm to Mr. Ragbir, the government does not seriously dispute that losing its Executive Director will harm the Coalition, and never explains how that harm can be remedied after trial.  And while Plaintiffs' cases addressing the loss of an employee addressed "competition concerns," Gov. Br. 49-50, that is not the only way the loss of an extraordinary employee harms and employer.  Plaintiffs' cases concluded that an injunction may be warranted to

prevent an extraordinary employee from competing with a former employer

precisely because a uniquely qualified individual like Mr. Ragbir is irreplaceable.

**B.     The Balance of Hardships and Public Interest Favor Preliminary Relief**

The balance of hardships favors Plaintiffs.  The government's supposed

interest in ending "a continuing violation of United States law," Gov. Br. 50, is

undermined by its willingness to allow Mr. Ragbir to remain here for the past 11

years.  Pls.' Br. 55.  The hardship to Plaintiffs absent relief, by contrast, would be

devastating.  *See id.* at 55-56; *Ragbir*, 2018 WL 1446407, at *18.

The government contends that the public interest in protecting immigrants

from wrongful removal is inapplicable here because Mr. Ragbir's claim concerns

not the merits of his final removal order, but rather "whether his valid final order

of removal was improperly selected for enforcement."  Gov. Br. 51.  That

reasoning is formalistic in the extreme, particularly where the Government

identifies no specific hardship to ICE or the public in protecting Mr. Ragbir—who

has resided here for more than a decade without incident—from the hasty

execution of a final removal order for unconstitutional reasons.

Indeed, the public interest strongly favors preliminary relief, as the amicus

briefs supporting Plaintiffs amply demonstrate.  *See* N.Y. Elected Officials Br. 21–

27 (ECF No. 131); Immigrant Rights Advocacy Organizations Br. 9–18 (ECF No.

149); Religious Leaders Br. 21-31 (ECF No. 146); Institute for Constitutional

Advocacy & Protection Br. 19-20 (ECF No. 121); *see also Ragbir*, 2018 WL 1446407, at *19.  The government suggests that the public interest now favors immediate deportation after the denial of Mr. Ragbir's most recent petition for review in 2016.  Gov. Br. 51.  But Mr. Ragbir has had two ICE check-ins since that ruling, A-0051, 56, and ICE has previously granted Mr. Ragbir administrative stays of removal even when he had no petition for review pending because he is not a flight risk or a danger to the community, A-0050, 117 , 257–58.  There is little public interest in Mr. Ragbir's immediate deportation, if any, but there is an immense public interest in preventing his wrongful removal and in upholding the First Amendment.

## CONCLUSION

For the foregoing reasons, the district court's order denying in part Plaintiffs' motion for a preliminary injunction should be reversed, or at a minimum vacated, and the case should be remanded for further proceedings.  For the avoidance of doubt, the Court's opinion and judgment should make clear that Mr. Ragbir's removal is stayed pending resolution of the merits of Plaintiffs' preliminary injunction motion on remand.

Date: October 5, 2018

Respectfully submitted,

/s   R. Stanton Jones
_____

R. Stanton Jones
William C. Perdue
Sally L. Pei
Andrew T. Tutt
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
stanton.jones@arnoldporter.com

Emily Newhouse Dillingham
ARNOLD & PORTER
  KAYE SCHOLER LLP
70 West Madison Street
Suite 4200
Chicago, IL 60602
(312) 583-2300
(312) 583-2360 (fax)
emily.dillingharn@arnoldporter.com

Ada Añon
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
(303) 836-8689 (fax)
ada.anon@arnoldporter.com

Alina Das
Jessica Rofé
WASHINGTON SQUARE
  LEGAL SERVICES, INC.
Immigrant Rights Clinic
New York University School of Law
245 Sullivan Street, 5th Floor
New York, New York 10012
(212) 998-6430
alina.das@nyu.edu

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2018, the foregoing was electronically

filed with the Court via the appellate CM/ECF system, and that copies were served

on all counsel of record by operation of the CM/ECF system on the same date.

Dated: October 5, 2018                                    /s/ R. Stanton Jones
                                                          R. Stanton Jones

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with Fed. R. App. P.

32(a)(7)(B) and (C) because it contains 6,990 words.  The brief also complies with

the typeface and style requirements of Fed. R. App. P. 32(a)(5) & 32(a)(6) because

it has been prepared in a proportionally spaced, roman style typeface of 14 points

or more.


Dated:  October 5, 2018                                      /s/ R. Stanton Jones
                                                            R. Stanton Jones